(100 South. 722)

No. 26239.

### JACKSON v. BRIEDE.

(Jan. 21, 1924. On Rehearing, June 20, 1924.)

*(Syllabus by Editorial Staff.)*

**1. Libel and slander ⚖️112(1)—Evidence held to sustain finding of slander.**

Evidence *held* to sustain finding that employer slandered stenographer by charging her with living with superintendent.

**2. Libel and slander ⚖️33—Actual damages need not be proven by woman charged with immoral conduct.**

Actual damages need not be proven, but are presumed, from falsity and malice of charge that girl had immoral relations with a man, and should be assessed in such form as may reasonably compensate victim for harm done to reputation as well as for humiliation and mortification.

#### On Rehearing.

**3. Libel and slander ⚖️121(2)—Damages reduced from $5,000 to $2,500.**

Verdict for $5,000 for slander of female by charging immoral relations with married man was excessive, and should be reduced to $2,500.

Land, J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Action by Marjorie Jackson against Albert E. Briede. Judgment for plaintiff, and defendant appeals. Modified and affirmed.

Paul W. Maloney and W. O. Hart, both of New Orleans, for appellant.

Woodville & Woodville, of New Orleans, for appellee.

By Division B, composed of Justices DAWKINS, LAND, and LECHE.

LAND, J. Defendant operates and is the general manager of an undertaking business and an insurance business conducted in a two-story building located at 1168 Camp street, in the city of New Orleans. The undertaker's office, where funeral arrangements are made, is on the first floor, and is known as defendant's office, and is occupied by defendant, his son, Albert E. Briede, Jr., and a George Cross, a funeral director.

The second floor of the building is divided into a general office, marked "Agents' room" on sketch, a room at the front of the building, designated as "funeral parlor," and the private office of Ernest A. Parra, the superintendent, adjoining the "funeral parlor."

There is a door from the funeral parlor and a door from Parra's private office opening into the "agents' room," or general office. The elevator is in the rear of the general office, or "agents' room," and a casket trimming room, with a door leading into the "agents' room," or general office, is behind the private office of the superintendent.

The agents' room is on the left as you reach the second floor, while the funeral parlor and the private office of the superintendent are on the right, with the elevator and the trimming room in the rear of these offices. A stairway leads from the undertaker's office on the first floor to the offices on the second floor, and there is a door on this stairway halfway up to keep out the draft.

The plaintiff, a stenographer employed by Ernest A. Parra, superintendent, and working in his private office, was discharged by defendant on Monday morning, November 27, 1922, without the knowledge of the superintendent, who, as soon as he was advised of her dismissal, telephoned to her at her home to come to the office, so that the matter might be investigated. On the arrival of the plaintiff at the office of the superintendent he descended the stairway as far as the draft door, and requested the defendant to come up stairs, as he desired to see him. Defendant complied with this request, and the present suit for slander against defendant is based upon the language alleged to have been used by him to Miss Jackson, the plaintiff, at the interview which took place between Parra, the superintendent, Miss Jackson, and the defendant on the second floor of this building. Plaintiff charges in her petition that on this occasion defendant called her a "damned woman," and, pointing at Ernest Parra, said to plaintiff, in the presence of Parra and Miss Phina Allemann, also a stenographer at the place, "You are living with this man, and I am not going to stand for

such disgraceful carrying on," and that, at the same time and on the same occasion, defendant addressed Parra, and said to him, in the presence of Miss Allemann: "This woman is breaking up your home, and, if you think you can get more out of her than you can out of me then go and follow the damned woman."

After this interview Parra escorted plaintiff from the building, and advised her to return home and to inform her father and mother as to the slanderous attack made upon her character by defendant.

The present suit was then brought by plaintiff against defendant, alleging that all of the said statements of the said defendant were false and slanderous, without any foundation in fact, and were made without probable cause and with malice, for the purpose of injuring, humiliating, and mortifying plaintiff and damaging her character and reputation.

Plaintiff claims damages against the defendant in the sum of $10,000 for the loss and impairment of her reputation and standing in the community, and in the further sum of $10,000 for the humiliation and mortification which she alleges that she has suffered, as the result of the conduct and defamatory statements of defendant.

The sole defense to this suit is a denial of the slander. After hearing the testimony in the case, which is conflicting, the trial judge awarded damages in favor of plaintiff in the sum of $5,000.

[1] The slanderous charges, as alleged by plaintiff, were clearly proven by the testimony at the trial, which was corroborated by the testimony of Ernest Parra, the superintendent of defendant, and by Miss Allemann, the other stenographer in his employment.

The plaintiff and her two witnesses testify positively that these slanderous words were uttered by defendant in the private office of the superintendent, and that the only

persons present were plaintiff, Parra, Miss Allemann, and defendant.

Plaintiff and Parra also testify that defendant was conducted by him first into the funeral parlor adjoining his private office, and that defendant then came out of the funeral parlor into the private office, where he made the slanderous statements assailing plaintiff's character for chastity.

Defendant and his witnesses state that the whole conversation between the parties occurred in the agents' room, or general office, and that defendant did not attack the reputation of plaintiff at all on that occasion. Defendant testifies that Parra asked him near the stove in the agents' room, or general office, what was the trouble between him and Miss Jackson. Defendant replied:

"I told him I telephoned her not to come down. I did not know she was down there at the time. Then I happened to look into the open door (to the private office of the superintendent), and I saw her in there, and then I walked in there towards the door, and I said, 'Hello; what are you doing here?' and she [plaintiff] says, 'Mr. Parra sent for me;' and I said, 'Did not I telephone you not to come down?' and she says, 'He told me to come along down.' I says, 'Young lady, you will do me a favor if you get out of this office.' She stamped her foot, and said, 'I will not, and I would like to see you put me out.' I got kind of sore, and I says to Parra, 'Take her out.' He took her off, and then he came back in a little while, and it was supposed to be all over, the argument; there was nothing to it."

The plaintiff and Miss Allemann stand before this court as young ladies whose reputations were not questioned by the defendant on the trial of this case. Miss Allemann has not the slightest pecuniary interest in the result of this suit, and was not even an intimate friend of Miss Jackson. Parra is not shown to have any pecuniary interest in this litigation, and is spoken of in the very highest terms by the defendant, who testifies:

"I would give my life—I would put my son out of the business for him time and time

156 LA.—19

again. I thought there was nobody like him; that the sun rose and set in him."

Defendant testifies that prior to the discharge of Miss Jackson in this case he had had no personal difficulty with Parra; that his relations with him had been perfectly amicable, and that the only thing that had happened between them is that Parra had placed plaintiff on the pay roll for one week during her illness, contrary to instructions. Parra denies this, stating that he received such instructions after he had placed plaintiff on the pay roll. Defendant states also in his testimony that before Miss Jackson's dismissal there was no misunderstanding between him and her. Parra had been connected with defendant in business seven years at the time of this unfortunate occurrence, and, evidently, his services had been highly satisfactory, as shown by his promotions by defendant, even over his own son. The attempt to discredit Parra, as a witness for plaintiff. merely because of some deficit on his part years ago, and while employed elsewhere, the deficit having been paid subsequently, comes with poor grace from defendant in the face of his protestations of affection for and implicit trust in his former superintendent.

A man who has the moral courage to stand by an innocent woman who has been basely slandered, even at the sacrifice of his own position, must necessarily entertain a high regard for both truth, justice, and honor. The attempt likewise to discredit the testimony of Miss Allemann merely because she failed to recollect or to hear all of the different conversations that took place in the private office when Miss Jackson was driven from the building is likewise ineffectual. Miss Allemann had imprinted indelibly upon her recollection the coarse epithet of "damned woman" hurled by defendant at Miss Jackson, as well as the shocking charge of "immoral relations" with a married man, shame-

lessly and publicly preferred by defendant against plaintiff on that occasion. This is language seldom heard by a lady's ears, and seldom uttered in the presence of a respectable woman. Naturally, it cameraed in her memory a more vivid picture than all else that was said upon that occasion. Naturally, also, the principals in this affair, the direct objects of this slanderous attack, would recall more distinctly and minutely what was said against each of them, as their characters, their mutual happiness, and their very ties of home itself were placed in jeopardy. The trial judge, who saw the plaintiff and her witnesses, and who heard them testify, has placed the seal of his approval upon the testimony of these witnesses, and we find no good reason for reaching a different conclusion in this case.

It is incredible, from the very atmosphere of the case, that a tried and trusted employee and two young ladies of good repute should attempt falsely and corruptly to charge an innocent man with slander for mere mercenary considerations.

It is equally incredible that any plaintiff, whatever might be her reputation, should attempt to extort money from an innocent man under a charge of slander, or under any other charge, if all of the witnesses which have appeared on the part of defendant in this case had been actually present on that occasion. The trial judge reached the conclusion that they were not present, and rejected their testimony, which is analyzed at length in his written reasons for judgment in this case.

The testimony of Miss Jackson and of Parra is clear and positive that when defendant came up stairs at the request of Parra he was invited into the funeral parlor, next to the private office of the superintendent. Parra testifies:

That after he and the defendant had entered the funeral parlor he closed the door, and said to defendant: " 'Mr. Briede, who fired Miss Jackson this morning?' He says, 'I did. This is my place'—and so with that he walked out, pushing the door open, and proceeded into the private office."

Miss Allemann was sitting at her desk in the private office, and Miss Jackson was standing near her, when defendant and Parra entered this private office, and all of the conversation between the parties, except what had been said between Parra and defendant in the funeral parlor, took place in the private office of the superintendent, and no one was present except Miss Jackson, Miss Allemann, Parra, and the defendant.

Parra asserts positively that when the defendant's son came up stairs he and defendant were not standing by the stove in the agents' room arguing, but that everything had been said and was over with.

Defendant testifies that when Parra came down the stairway and asked him to come up stairs his son, Albert E. Briede, Jr., came up the stairs behind him.

The son testifies:

That the conversation between his father and Parra as to the discharge of Miss Jackson took place at the head of the steps, and that his father looked into the window of the private office, and, seeing Miss Jackson in there, said to her: " 'Didn't I call you up and tell you not to come to work?' She said, 'Yes; but Mr. Parra said to come down.' My father asked would she kindly go out of the office, and she said she would not. My father asked her again to leave, and she stamped her foot, and said she would not go at all, and Mr. Parra took and led her out of his office; he said that he did not want her in there; and then she went down the steps and went off."

The statement of this witness that "he said that he did not want her in there" evidently refers to defendant, and not to Parra as Parra had telephoned plaintiff to come down to the office, and get the matter of her dismissal straightened out.

When this witness was asked on cross-examination why he followed right behind his father up stairs, he answered:

"Because I knew something was coming up; that is why I wanted to be prepared to protect my father, then; that is why I went up with them."

However, George Cross, the embalmer and funeral director for defendant, testifies:

"I was standing at the door down stairs, where I belong, and Mr. Briede, Jr., was at his desk, and we heard a noise up stairs, and I naturally turned round, and Mr. Briede ran up stairs, and I followed him. I got about nearly half way up, and I stopped, and Mr. Briede went all the way up, and Mr. Briede, Sr., was talking very loud."

So it appears from the testimony of George Cross, a witness for defendant, that Albert Briede, Jr., did not follow his father up stairs as soon as Parra called him. He could not, therefore, have heard all of the conversation on that occasion. It also appears that Cross was not standing at the head of the stairs, as testified by Briede, Jr., but stopped halfway, at the draft door on the stairway. Defendant also testifies that he saw Miss Jackson in the private office of the superintendent through an open door, and not through a window. He states also that the conversation with Parra commenced at the stove in the agents' room, and not at the head of the stairs, as sworn to by his son.

Henry B. Caserta, a casket trimmer, testifies that he was in the trimming room back of the agents' office, and heard the loud talking of defendant, and when he first looked out, he saw Albert Briede, Jr., standing by the stove in the agents' room, when, as a matter of fact, Briede, Jr., was down stairs at his desk at that time, as testified to by Cross.

This witness also testifies that Miss Jackson "stamped her foot," and said that she would not get out, when ordered to do so by defendant, although the witness admitted that Miss Jackson was in the private office of the superintendent, and that he could not see her at the time.

Even the automobile mechanic for defendant, Louis F. Lacroix, whose department is down stairs, is found bringing up caskets in the back of the agents' hall, and "helping Cross to move some caskets around," when Cross, at the time, states that he was down stairs at the front door looking out, and ran half way up the stairs and stopped when he heard the very loud voice of defendant.

Not a single witness of defendant pretends to repeat a word uttered by Parra on this occasion. Not a single witness of defendant pretends to repeat a word uttered by Miss Jackson, except the statements which defendant declares she made—that she had been sent for by Parra, and refused to leave when ordered by defendant, that she "stamped her foot"—and that defendant did not attack her character. Not a single witness of defendant notes the presence of Miss Alleman, but, with the exception of Cross, all testify to presence of Albert E. Briede, Jr., from the beginning to the end of the conversation between Miss Jackson and defendant.

Notwithstanding the fact that some of these witnesses are connected with departments on the first floor of this building, yet we find them out of their usual places of duty on this occasion—on the stairway, in the agents' office, and in the casket trimming room—yet all of these witnesses were invisible, at the time, to plaintiff and her two witnesses. What did defendant say to the plaintiff besides the statements testified to by defendant and his witnesses? Parra swears:

That he said to her: "'I don't want this woman in here. Get this woman out of here. She is no good. Get her out of here, or I will throw her out.' I said, 'That is no way to talk to a lady. Remember, you are talking to a lady. You are not talking to a man.' He says, 'She is no lady. She is nothing but a

damned woman; that is what she is.' He says: 'You know you are living with this woman. If you had any respect for yourself you would not come into this office. I don't want. any disgraceful carrying on like this in my office.' "

What does the plaintiff testify that the defendant said to her on this occasion? She states:

That he said, " 'You are running with this man.' I looked at him, and he said, 'You have immoral relations with this man;' and he pointed to Mr. Parra. He was walking rapidly back, to and fro, and then he rushed to Mr. Parra's desk, and he said: 'I will not have this damned woman in this office; that is all there is to it. I will not have this damned woman in this office. This disgraceful carrying on, Mr. Parra, I cannot stand, out of respect for your wife and child;' and I said, 'Mr. Briede, don't talk to me like that.' "

The plaintiff testifies that she left the building weak and faint and trembling, and went home humiliated and ashamed at such treatment.

Miss Allemann corroborates the testimony of plaintiff and of Parra, and testifies that, while she cannot recall all that defendant said, yet she remembered that defendant stated that "he did not want. this 'damned woman' in the office," and that plaintiff had "immoral relations with this man," pointing at Parra.

Plaintiff denies that she stamped her foot at all on this occasion, and her testimony is substantiated by Miss Allemann.

We have been greatly impressed with the testimony of plaintiff and of her two witnesses. The trial judge has accepted this testimony as credible and trustworthy, while the testimony of the defendant and of his employees is not only contradictory in itself, but is flatly contradicted by the testimony of the plaintiff and her witnesses. Moreover, the testimony of these employees is strikingly and suspiciously similar in its details to that of defendant.

The plaintiff, in our opinion, has made out her case with reasonable legal certainty.

The reputations of men may heal of the wounds inflicted by the poisoned shafts of defamation, but no one can well estimate the irreparable injury that may be done to a young girl, at the very threshold of womanhood, by the viperous tongue of slander.

[2] In this class of cases, actual damages need not be proven, but are presumed from the falsity and malice of the charge, and should be assessed in such a sum as may reasonably compensate the victim of the slanderous attack for the harm done to her reputation and standing in the community, as well as for the humiliation and mortification to which she may have been subjected. Delambre v. Kyes, 136 La. 687, 67 South. 552; Vicknair v. Daily States, 153 La. 677, 96 South. 531.

The quantum of damages allowed by the trial judge, together with the complete vindication which plaintiff receives at the hands of this court, fully meets, in our opinion, the ends of justice in this case.

Judgment affirmed, at the cost of appellant.

On Rehearing.

By the WHOLE COURT.

ROGERS, J. [3] A rehearing was ordered in this case for the sole purpose of reconsidering the amount of the judgment rendered in favor of plaintiff. A re-examination of the case on that point has satisfied us that the judgment was excessive.

There is no case analogous to the present one in our jurisprudence where the court has allowed damages even approximating the amount awarded in the instant suit. The damages in all of these cases, many of them of a more aggravated and serious nature than the present one, range from $100 to $1,-500.

While it would be impossible to fix upon any particular sum of money which would

compensate plaintiff for the humiliation and injury which she suffered at the hands of the defendant, there must be, nevertheless, some reasonable basis for the award, and the court should not impose a penalty in money greater, perhaps, than the defendant can pay.

We think that under all the circumstances of this case a judgment in plaintiff's favor of $2,500 will do equal justice between the parties, and not be out of line with our former jurisprudence when considered in connection with present day economic conditions.

The favorable judgment in the case is in itself a vindication of the plaintiff and a rebuke to the defendant.

For the reasons assigned, our former decree is recalled, and it is now ordered that the judgment appealed from be amended by reducing the judgment in favor of plaintiff and against defendant from $5,000 to $2,500, and that as thus amended the said judgment be affirmed. Plaintiff to pay costs of appeal.

LAND, J., dissents as to reduction of judgment.