Plaintiff, Mrs. Ethel Hartman, alleges that she was bitten on two different occasions by a dog of defendant, E. Lysle Aschaffenburg. The first attack is alleged to have been made on September 17, 1937, at about 8 o'clock in the morning, on the sidewalk of Josephine Street between St. Charles Avenue and Carondelet Street. The second is alleged to have taken place at about the same place on April 21, 1938.
On the first occasion, she states that she had carried her own "little Boston Bull" across the street and had put him down upon the sidewalk, and that as she was leaning over to "unsnap the leash * * * a wire-haired fox terrier * * *" of defendant "came from the back * * * and grabbed me through my finger, * * * and I fell, naturally, over my dog, and that little dog kept biting me."
On the second occasion, plaintiff says that she was standing on the sidewalk with her own little dog in her arms when the other dog broke away from its keeper "and jumps up and bites my arm, and pulls me to the sidewalk."
In her petition, plaintiff charges that defendant's dog had previously exhibited vicious characteristics and that "to the knowledge of the defendant" it had "attacked many others prior to the attack made upon your petitioner."
Defendant, by exception of vagueness complained of the failure of plaintiff to give the details of these alleged earlier attacks. This exception was overruled and then defendant filed answer denying that plaintiff had been bitten, and averring that even if she had been so bitten, he was not liable for the reason that his dog "was a gentle animal, had always been of a kind temper, had never attempted to bite anyone and had never given respondent occasion to suspect that it would bite anyone." And defendant also averred that if plaintiff was bitten, as she alleged, the bites had resulted from her "own imprudence or negligence" in "attempting to intervene in fights between her dog and respondent's dog."
The District Judge reached the conclusion that plaintiff had been bitten as alleged and he awarded damages ($350) for the result of the second attack only, expressing the opinion that prior to the first attack, defendant had no knowledge of any vicious characteristics of the dog, and therefore could not be held liable for the results of that attack because of the established jurisprudence that the harborer of a domestic animal is liable for the damage caused by the animal only if, prior to the occurrence, the animal, to his knowledge, had exhibited characteristics likely to cause such damage.
From this judgment defendant has appealed, contending that since the judge below found as a fact that the animal had never exhibited vicious tendencies towards persons but had confined his belligerency to attacks upon other dogs, there could be no recovery by a person for a bite caused by an attack, not on that person, but on another dog, even though, by accident, injury to the person had resulted.
Plaintiff has answered the appeal asserting that she is entitled to recover for the first attack also. She contends that even if the dog had not previously attacked persons it had, to the knowledge of defendant, habitually attacked other dogs and that he should have known that such attacks would probably result in injury to persons, and that therefore by harboring *Page 284 
the animal he made himself liable for such damage as might be caused by it.
Defendant, E. Lysle Aschaffenburg, is President and Manager of the Pontchartrain Hotel located at the corner of St. Charles Avenue and Josephine Street, in New Orleans. He lives in the hotel; and for several years owned and "harbored" in his apartment a wire-haired fox terrier dog bearing the name "Jiggs". He sometimes permitted this dog to roam at large.
It also appears that plaintiff, Mrs. Ethel Hartman, lives at 1625 Josephine Street, which is near the rear of the Pontchartrain Hotel; that she owned two dogs, one of which was a small Boston Bull.
There is no contradiction of her testimony that at about 8 o'clock on the morning of September 17, 1937, as she had carried her own dog across Josephine Street and had placed it on the ground, and was about to unleash it, the Aschaffenburg dog, Jiggs, rushed up and bit her right, middle finger. There is a controversy over the seriousness of the bite, and concerning whether or not she was bitten in other places. She says that after biting her on the finger, as she fell over her dog — apparently to protect him — "that little dog kept biting me", and she added that it bit her "on the finger and all over my thighs, on the limbs, the back, I guess you would call it, of my limbs." Her physician, Dr. Lindner, said that "apparently" there had been only one bite at that time, and he expressed the opinion that she had fallen and "received contusions of the back and both legs and thighs, the middle aspect of both legs below and above the knees and multiple abrasions of both legs."
There is also a controversy concerning the "intention" of the dog — did it intend to bite plaintiff or did it bite her accidentally in its efforts to injure the little Boston Bull which she was protecting? There is a dispute too as to whether plaintiff reported that she had been bitten or whether she went to the hotel to report that her dog had been bitten.
However, as a result of this incident, she was treated by Dr. Lindner, her physician, for 14 days during which time he administered the Pasteur treatment. She remained under his care until March 30th, 1938. The bill which he ultimately rendered for $200 included a charge of $150 for the treatment on this first occasion.
At the time of the trial below, no part of the bill had been paid.
The second attack took place on April 24, 1938, under somewhat similar conditions. This time she was carrying her Boston Bull in her arms. She was on the sidewalk, near St. Charles Avenue, when she heard a call from someone who had charge of the Aschaffenburg dog, that he could not hold it. It broke away and, either in an attempt to bite her or to bite her dog, bit her.
Dr. Lindner says that on this occasion he treated her "for a dog bite of the right arm at the elbow." She remained in his care until September 27, 1938, but it was not necessary to repeat the Pasteur treatment.
Although Article 2321 of our Civil Code provides that "the owner of an animal is answerable for the damage he has caused" and does not make that liability dependent upon whether the owner had previous knowledge that the animal was possessed of traits or characteristics indicating the probability that the animal might cause damage, it is well settled in the jurisprudence of this state that the owner of a domestic animal, one that is "mausuetae naturae", is liable only if to the knowledge, either constructive or actual, of the owner, the animal has previously exhibited such traits. We need not cite the many decisions from which it can now be said that this rule is firmly established. Practically all are cited in Woulfe v. D'Antoni, La.App., 158 So. 394, 400.
Defendant relies upon this well established rule. He asserts that his dog was extremely gentle, but he says that even if he had previously exhibited dangerous characteristics, he did not know of them and, in fact, did not know that plaintiff had been bitten on the first occasion.
While plaintiff has alleged that the dog had previously bitten many other persons, she has failed utterly to offer any proof of these earlier attacks. Where a domestic animal is shown to have injured someone as a result of characteristics likely to cause injury, the owner, if he wishes to escape liability, is under the necessity of showing lack of knowledge on his part of any previous attacks or that the animal had theretofore exhibited such characteristics. In other words, the burden of proof is on the owner of the dog to show absence of knowledge on his part.
"Where the person attacked or bitten was without fault, the burden of proof is on the owner to show that the dog had always been of a gentle disposition, and had never attacked or bitten anyone, or given occasion *Page 285 
to suspect that it would do so." Woulfe v. D'Antoni, supra.
See, also, Damonte v. Patton, 118 La. 530, 43 So. 153, 8 L.R.A., N.S., 209, 118 Am.St.Rep. 384; Ladrix v. D'Maggio, 8 Orleans App. 167 and Mercer v. Marston, 3 La.App. 97.
The owner here has, we think, borne this burden to the extent that he has shown that if the dog had previously bitten any other person, he had no knowledge of such an occurrence, but he has failed to show that he did not know that his dog had formed the habit of attacking other dogs. In fact the record shows by an overwhelming preponderance that though this dog had never been hostile to persons, it had always shown antagonism towards other dogs and it shows too that whenever another dog appeared, this dog was anxious to commence hostilities.
Dr. Chapman, a veterinarian who "took care of Mr. Aschaffenburg's dog, Jiggs," and who was placed on the stand as a "character" witness for the dog, said that though "he was a regular pet" so far as persons were concerned, "wire-haired fox terriers are of a snappy nature and will attack another dog on sight with slight provocation."
Jake Walton, who, at the time, was Manager of the Pontchartrain Hotel, said that "Jiggs was a dog that would bite another dog if they showed fight and he was a good scrapper."
Wm. Chapman, who says that at that time he was Chief Engineer at the hotel, testified that Jiggs "was always ready to fight" and that "if he had a chance at another dog, he would fight any dog."
Emma Hoft, a neighbor, says that Jiggs "was known around the neighborhood as a vicious dog", and Mrs. Mary Roig, who lived with the plaintiff, says that he was a "vicious dog."
We think it quite clear that the dog, though not hostile to humans, was a fighter and that he enjoyed attacking other dogs whenever the opportunity presented itself. And we think also that these characteristics could not have been so well known by others without knowledge thereof in Mr. Aschaffenburg, the defendant. And the District Judge was of this opinion also. He said:
"The Court is satisfied from the evidence that the defendant's dog was not a vicious animal in so far as persons are concerned, but is satisfied from the evidence that it was a wire-haired fox terrier, and that a dog of this breed is a vicious animal in so far as its characteristics toward other dogs are concerned, and that the defendant, as well as his employee, to whom the dog was entrusted when taken out for exercise, had knowledge of the fact that the defendant's dog, without provocation, would attack other animals if the opportunity presented itself."
The question presented then is an interesting one. May there be recovery from the owner of a dog for damage caused by the dog's biting a person who is protecting his or her own dog from an attack by defendant's dog, where it appears that the attacking dog, though it had not previously exhibited any viciousness towards persons, had been known as an animal always ready to attack other dogs?
As is shown in Mercer v. Marston, 3 La.App. 97, the rule that an owner of a domestic animal is liable for the results of damage caused by the animal only if he had previous knowledge of the character of the animal is not based on Article 2321 alone but grows out of the fact that the Supreme Court has interpreted that article in connection with Articles 2315 and 2316, and has held that liability is based on the negligence of the owner resulting from the fact that with knowledge of the animal's characteristics, he has persisted in maintaining and harboring it. If those characteristics are such that the animal, though not vicious to human beings, will probably cause damage because of its mischievousness, or because of its tendency to attack other animals, then liability of the owner should result if damage is caused by a display of those characteristics, just as it would result should the damage be caused by viciousness. Where it is well known that a dog is in the habit of attacking other dogs on sight, the owner should realize that the owners of such other dogs will naturally attempt to defend their animals, or to intervene to prevent such a fight, and that damage is very apt to result.
Defendant, himself, realizes that it is almost instinctive for the owner of a dog to interfere if some other animal attacks his for, in explaining how he had himself been bitten on an earlier occasion, while attempting to prevent another dog from attacking Jiggs, he said:
"I did exactly the same thing as I presume somebody else would have done, tried to separate the dogs and I was bitten." *Page 286 
It is not necessary that we go so far as to hold that there would be liability towards a person who might be bitten while attempting to prevent a fight because the record shows that plaintiff did not, on either occasion, attempt to intervene or voluntarily inject herself into the melee. The first time, she was bitten while leaning over, attempting to unleash her dog. Jiggs, defendant's dog, rushed up and bit her on the finger, and possibly in other places on her lower limbs. On the second occasion, she had her own dog in her arms, when Jiggs jumped up and bit her on the arm. On both occasions, the result was exactly what might have been anticipated as a result of allowing such a dog as Jiggs to roam upon the public streets.
In Mercer v. Marston, supra, recovery was allowed against the owner of dogs which were not vicious but were in the habit of "jumping and barking at anybody that passed by." The plaintiff, frightened by the dogs, kicked at them and backed away from them, and, in doing so, fell and broke her ankle. The Court of Appeal for the Second Circuit, after a full discussion of the jurisprudence on the subject, held that it is not at all necessary to a recovery in such a case that it be shown that the dog involved is vicious, and that all that is necessary is that it appear that the dog be possessed of characteristics or habits which, though only mischievous, are apt to cause damage, and that the owner know of these habits or characteristics, and that the damage be caused by them. The court quoted with approval the following from 3 C.J. 97:
"`At common law, the owner of a dog is not liable for injuries caused by it, unless it is vicious and notice of that fact is brought home to him. But when it is once established that the dog is of a vicious or mischievous nature, and that the person owning or keeping it has knowledge of that fact, the same responsibility attaches to the owner to keep it from doing mischief as the keeper of an animal naturally ferocious would be subject to, and proof of negligence on the part of the owner of the dog is unnecessary.
"`The intent with which a dog inflicts an injury is not material, and its owner, having knowledge of its evil propensity, is liable for injuries which it may inflict in playfulness.'"
In the Mercer case the court, after reviewing many authorities, said:
"On this review of the authorities, it is our opinion that the law makes no distinction between an animal dangerous from viciousness and one merely mischievous or dangerous from playfulness, but puts on the owner of both the duty of restraint when he knows of the animal's propensities; that he is presumed to know the animal's propensities whether it is dangerous from either cause; that in this case the defendant has not rebutted this presumption that the dogs in this case were dangerous, being given to running, jumping and barking at passersby that defendant might reasonably have anticipated that this propensity would lead to the infliction of an injury on someone, such as actually occurred in this case, or otherwise — if, indeed, the mere fright to which passersby were subjected is not itself an injury or at least an invasion of their right to travel the streets unmolested; that it was therefore his duty to restrain the dogs; and that his failure to do so was sufficient negligence to make him liable for the injury suffered by plaintiff."
This conclusion seems to us to be identical with that set forth in C.J.S., Vol. 3, § 148, page 1250, under the title "Animals":
"A vicious propensity is a propensity or tendency of an animal to do any act that might endanger the safety of the persons and property of others in a given situation. Although an animal is actuated solely by mischievousness or playfulness, rather than maliciousness or ferociousness, yet, if it has a tendency to do a dangerous or harmful act, it has a vicious propensity within the meaning of the rule holding the owner or keeper liable for injuries resulting from vicious propensities of which he has knowledge."
When the court in the Mercer case, after expressing the views which we have quoted, rendered a decree holding the owner of the dogs liable, an application was made to the Supreme Court for a writ of review. The Supreme Court refused to grant the writ and said:
"We find no error of law in the opinion * * *."
If that rule of law be applied to the facts presented here, we think that the only possible result is a holding that the defendant is liable for the damage caused on both occasions.
There is nothing to contradict the testimony showing that the bill of the doctor *Page 287 
amounted to $200. After the first bite, plaintiff was subjected to the pain, annoyance and inconvenience of taking the Pasteur treatment. This required fourteen injections on consecutive days. At that time, according to the doctor, though there was only one abrasion which he could identify as a result of a bite and that was on the right, middle finger, plaintiff had received multiple contusions on the back, both legs and thighs, and, the doctor added that "she was suffering quite a bit of shock and very much up-set."
She had "several fainting spells, very, very nervous * * *". During these fourteen days plaintiff was "almost bedridden." She remained under the doctor's treatment until March 3rd, 1938, or for a total period of about four and a half months.
When she was bitten the second time, she remained under treatment from April 24th to June 27th. This time the bite caused a laceration of her elbow.
In Perez-Sandi v. Berges, 12 La.App. 191, 125 So. 185, 187, we allowed recovery of $500 for dog bites. There the plaintiff "was bitten 22 times and the essential medical treatment involved considerable pain and suffering."
In Montgomery v. Koester, 35 La.Ann. 1091, 48 Am.Rep. 253, the Supreme Court allowed $500 for dog bites.
In McGuire v. Ringrose, 41 La.Ann. 1029, 6 So. 895, 896, the Supreme Court allowed $500. There "* * * the plaintiff was bitten in the groin by the dog, she receiving there [three] severe wounds, which were treated by two physicians. From these wounds fever resulted, and she remained under treatment very nearly two months, and, during her confinement, suffered great pain and anxiety of mind. * * *".
In Anderson v. D'Ingianni, 16 La.App. 560, 134 So. 412, plaintiff was awarded $1,500 for injuries which we consider much more severe than those sustained by the present plaintiff.
Counsel for plaintiff has cited many authorities to the effect that the ability of the defendant to pay may be taken into consideration in assessing damages. Jackson v. Briede,156 La. 573, 100 So. 722; Gallman v. Young, 6 La.App. 137; Loyacano v. Jurgens, 50 La.Ann. 441, 23 So. 717; Daly v. Kiel, 106 La. 170, 30 So. 254; Perez-Sandi v. Berges, 12 La.App. 191, 125 So. 185. See, also, Punitive Damages in Louisiana, Loyola Law Journal, Vol. 10, page 26. And he argues that since defendant admits that he has a good position, the amount awarded should be increased.
But while this rule seems to have been established in this state, it may be availed of only for the purpose of protecting a defendant who is unable to pay from being deprived of everything that he may have; in other words, only for the protection of the poor defendant. It may not be used to increase the award merely because the defendant is in affluent circumstances. This principle applies in mitigation and not in aggravation of damages. We take into consideration the fact that at the present time, because of the war conditions, and the increased price of all commodities, the purchasing power of the dollar has been very much reduced. Wyble v. Putfork, La.App., 141 So. 776.
In view of all of these circumstances, and in view also of the fact that the plaintiff will be required to pay a doctor's bill of $200, we have decided to increase the total award to $950.
The judgment appealed from is amended by the increase of the amount thereof to $950, with legal interest from judicial demand, and, as thus amended, the judgment is affirmed at the cost of defendant.
Amended and affirmed.