LAND, J.
This is a suit for damages for personal injuries alleged to have been occasioned on the night of February 3, 1905, by a collision between a runaway horse and wagon belonging to the defendant and a street car operated by plaintiff as motorman. The petition charges that the defendant was guilty of negligence in leaving his horse and wagon standing in' the street without securing the same or leaving some one in charge thereof; that while petitioner was operating his car at 3:15 o’clock in the morning, and coming down Coliseum street, he was suddenly confronted by said horse and wagon, without a driver or lights, dashing up the street with break-neck speed; and that it was impossible to stop the car in time to avoid the collision, which smashed the dashboard of the car, and inflicted serious and painful injuries on the plaintiff. The petition charges that plaintiff’s left foot was broken and the ligaments of his left knee were injured, causing him great pain and suffering, and permanent ■ injury. Plaintiff alleges that he is entitled to recover $1,500 for pain and suffering, $5,000 for loss of earning capacity and for being made a cripple for life, and $500 for punitive and exemplary damages.
Defendant answered, pleading the general issue and contributory negligence, but admitting the ownership of the horse killed in the collision referred to in the petition.
The case was tried before the court without a jury, and there was judgment in favor of the defendant. Plaintiff has appealed.
In his written opinion the judge says:
“Defendant’s driver lost his hat. He got out of his wagon to get his hat. The horse started off. He started for his wagon, but his foot slipped, and the horse got away.”
According to the testimony of the driver, the wind blew off his hat, and he thereupon turned his horse towards the gutter and got off the wagon, and when he went to get his hat in the drizzling rain the horse “ran off.”
The driver promptly followed his horse and cart a considerable distance, and found his wagon “stuck up in the Coliseum car,” and his horse on the side with a broken leg. The driver says:
“I told the corporal I left my horse standing to go and get my hat, and, while I was doing that, the horse ran away. If I had not slipped, I would have caught her.”
The conductor on the car testified that the driver said, after the accident, that while he was delivering meat his horse ran away. The driver denied making any such statement. One witness saw the horse near the Ninth Street Market, going at a slow trot, and tried to head him off, but the animal “ran out Harmony street.” The market referred to is 23 squares from the place of the accident. There is no affirmative testimony that the horse was gentle, but the judge seems to infer that he was, because two witnesses testified that on the night in question he was not traveling very fast. A witness for the plaintiff testified that the defendant said: “That was a wild horse I had. He did not care for the horse.” Defendant did not deny making such a statement, but the judge remarks that the testimony was taken out of court and out of the presence of the defendant, who was not questioned as to the alleged statement. The judge seems to have been mistaken as to the absence of the defendant, as the record, reads as follows:
“Witness, pointing out Mr. Patton, who had entered the room after his evidence began, says *533 that ‘He is, I believe, Mr. Patton, and he is the one that told me about the wild horse in-the market.’ ”
The fact that a runaway horse in the course of a long flight may have reduced his speed to a trot is very slight evidence on which to predicate his gentle character. If he had been a gentle, tractable animal, his owner and his driver would probably have so testified. In leaving the horse standing in the street the driver violated the city ordinance reading as follows:
“That all drivers of vehicles in the city of New Orleans are expressly forbidden to leave their seats or quit hold of their reins under a penalty of a fine of ten dollars for each contravention.”
By the same ordinance every hack, cart, or vehicle standing on the streets is required to have “lamps” and shall keep them lighted when employed or running at night. There was one lantern or lamp on defendant’s cart, and this was jolted off prior to the collision.
In Zambelli v. Johnson & Son Co., 39 South. 501, 115 La. 483, this court held that:
“It is negligence for the driver of a team of horses to abandon his seat upon the box and his hold upon the reins, and to leave his team standing in a frequented place, and, where it appears probable that they might have been controlled if he had been in the proper position to control them, his employer will be held liable in damages for injury inflicted by them upon a third person in running away.”
The law is “that the owner of an animal is answerable for damage he has caused” (Civ. Code, art. 2321); and the presumption is that the owner of the animal is in fault, and the burden is on him to show that he was without the slightest fault and did all that was possible to prevent the injury. Bentz V. Pag-e, 115 La. 560, 39 South. 599. There can be no escape from the conclusion that the driver was in fault in leaving the horse loose in the street while he was chasing his hat.
The judge a quo held that the driver was not negligent, and on the question of contributory negligence says:
“Here was a motorman traveling at full rate of speed on a very dark night at a spot where every electric light was out. We believe he was unquestionably reckless.”
The schedule required a speed of about a mile in five minutes, but, of course, the speed was not uniform. The car had to make “slow ups,” and had to go more slowly around curves. In answer to a question as to the rate of speed at the time of the accident, the conductor said:
“About eight miles an hour. Given full power, the car does not take up speed until she runs four blocks. There was a bend; we went slow there.”
The existence and location of this bend or curve is not disputed. The motorman said that the car was going at full speed, but that he did not know the rate, as some cars have more speed than others. It was the duty of the motorman to run his car according to schedule time, and there is nothing to show that the prescribed rate was exceeded on the occasion in question, or that the schedule as fixed violated any police law or ordinance. The accident happened at 3:35 o’clock in the morning, when the town was asleep, and the danger of collision with persons or vehicles was at the minimum. The collision took place 90 feet from the crossing, and the affirmative evidence shows that the motorman did all he could to avoid the injury. The horse and wagon came rapidly up the track, and, when they became visible to the motorneer, were not more than 40 feet from the car. There was no light on the wagon, and it was impossible for the motorneer to have seen the danger in time to avoid the accident. The conclusion of the district judge is based on the predicate that the motorneer should have foreseen that some horse and wagon, without a driver or lights, might come tearing up the track at a place where the electric lights were out.
In Gallaher v. Crescent City R. R. Co., 37 La, Ann. 288, Bermudez, C. J., said:
*535 “In the case of Hearn, 34 La. Ann. 163, this court held that the driver [of a street car] can be justly charged with negligence only when he fails to observe something he ought to see and would see with ordinary vigilance, when he fails to be prepared for something visible, or at least of probable occurrence or that might be reasonably expected to happen.”
Thompson, on Negligence, vol. 1, p. 382, says: (
“Moreover, it is a sound view that a person is not chargeable with contributory negligence in not anticipating that other persons will be negligent or will violate the law, and in not providing against such possible violations of it.”
We do not think that the motorman was required to anticipate such a danger as a runaway horse and wagon, without a driver and without lights, in the darkest hour of the night, rushing unexpectedly towards him.
There is nothing in the evidence to justify the conclusion that the motorman jumped from the ear at the moment of collision.' If he had done so in order to save himself, the legal situation would not be changed.
The vestibule of the car was practically wrecked by the collision. One of the shafts of the wagon was driven through the vestibule and the front of the car. The wagon landed on the top of the platform, and the horse hung suspended by the harness. The front controller was bent or crushed back. The motorman was struck by something, and knocked off unconscious. He says:
“When I came to my right senses, I found myself in the street three feet from the gutter. I got up and fell back into the mud. I looked down the street. I called my conductor, ‘for God’s sake come help me.’ He came to my assistance, and he asked me if I was hurt, and I told him I thought my foot was broken.”
That as the result of the collision the plaintiff was hurled from the car and severely injured in his left foot is beyond dispute. He was confined to his bed for six weeks, was on crutches for some time, and returned to his work on June 3, 1905. Of course, the plaintiff suffered pain and according to his testimony could not use his injured foot without pain down to the time of the trial in June, 1905-
The condition of the plaintiff on February 14, 1905, is thus described by his attending physician:
“I found that his foot had been sprained and the shreds of the small bone of the instep had been torn. The ligaments between the bones had been torn, and the foot contused and mashed.”
'In answer to the question whether the wound could have been the result of jumping from the car, the witness replied:
“That might have been possible so far as the sprain went; but it could not be possible as far as the contusion went. This led me to believe that it had been struck a blow, because the skin had been knocked off the foot.”
The witness attended the plaintiff over a month, and was consulted about the foot down to the date of the trial, and at that time found that the condition of that member “was not good.” The witness could not say-that the injury would prove permanent, but was of the opinion that the foot would never be as good as it was before the accident, as a sprained joint is never as good as it was before. He further testified that the plaintiff suffered a great deal; that his foot was swollen for at least six weeks, during which time the plaintiff had to lie fiat on his back and keep the foot elevated all the time; and that • plaintiff could not use his foot at all. The witness advised the plaintiff to give up his job of motorman and find something else to do that would not necessitate standing on his foot. This advice the plaintiff did not follow, and the-witness was of opinion-that the failure to do so aggravated the original injury, as absolute rest was necessary to effect a cure; but the witness did not think that the plaintiff would have been perfectly cured even if the advice had been followed. The plaintiff testified that he tried but could not get any other job, and that he had to work or starve. Plaintiff has been pursuing his work as a motorman since June, 1905, *537 and has lost in all about 5% months’ time. He testified that his foot still pained him when at work.
Considering plaintiff’s pain and suffering, loss of time, medical expenses, and the impairment, although temporary, of the free use of his foot, we think an allowance of $1,500 as damages reasonable.
It is therefore ordered that the judgment appealed from be reversed, and it is now ordered that the plaintiff, Charles A. Damonte, do have and recover of the defendant, Oliver Patton, the full sum of $1,500, with legal interest from the date of this decree, and all costs of suit in both courts.