## MATTHEWS v. GREMILLION et al.

### No. 5443.

Court of Appeal of Louisiana. Second Circuit.

June 1, 1937.

Gist & Thornton, of Alexandria, for appellants.

Hawthorn, Stafford & Pitts, of Alexandria, for appellee.

TALIAFERRO, Judge.

Defendant Mrs. Alice C. Gremillion, individually and as tutrix of her minor son, Field V. Gremillion, Jr., appealed from a judgment condemning her to pay to plaintiff the sum of $6,500 as damages resulting from a compound comminuted fracture of the femur bone of his left leg, caused by the kick of a mare, the property of said widow and heirs of the late Dr. F. V. Gremillion, deceased, which animal at the time of the injury was being ridden by said minor. The accident occurred on the morning of April 23, 1936, at a dipping vat near the town of Pineville, La.

The petition declares that plaintiff carried his mule to said vat for the purpose of having him dipped, as was then required by law, and on arriving there he discovered a large number of persons had preceded him with their stock and were in the act of dipping them or were awaiting an opportunity to do so; that as he was in no hurry to have his own mule dipped, he took a position some 30 yards from the vat's inclosure to wait until the rush had ceased; that after tarrying there for a while, he observed young Gremillion and another young man ride up on spirited saddle horses, who apparently had come there to have their mounts dipped, but instead of quietly waiting their turn near the vat, as all others were doing, they proceeded to ride up and down the road nearby and cause their horses to prance in and out among the waiting people; that in the course of these maneuvers, they rode very close to petitioner, so close once or twice that he feared they would run over him, but he held his position and mule, awaiting a favorable opportunity to dip him. He then alleges:

"Petitioner shows that finally one of the said boys, Field Gremillion, Jr., after riding back and forth among the people unneces-

sarily, rode his horse directly up to petitioner and, as he neared petitioner, wheeled his horse around so that the horse's heels were directly toward petitioner; that then the said Field Gremillion, Jr., either kicked or spurred the horse in the flank and the horse immediately kicked out behind him, striking petitioner's left leg and knocking him to the ground.

"Petitioner shows that the acts of the said Field V. Gremillion, Jr., as hereinabove set forth, constituted negligence which renders him liable to petitioner for the resulting injuries; that Mrs. Alice C. Gremillion, the mother of said minor, is likewise responsible to petitioner for the tortious act of her minor son who resides with her and is under her parental authority and control; that the sole and only cause of said injuries to petitioner was the negligent action of the said Field V. Gremillion, Jr., as above mentioned, and that petitioner did in no manner whatsoever contribute thereto."

Defendant admits the ownership of the mare, as alleged, and that plaintiff was injured by a kick from her at the time and place set forth, when mounted by her said minor son. Liability for the results of the accident are denied, as well as the charges of negligence made against the said minor son. She further alleges that her said son and his cousin, Ben Gremillion, each mounted, drove a cow to said dipping vat early on the morning of April 23d for the purpose of having the three animals dipped, and after they were dipped, all were left hitched away from the inclosures so that the dip solution would drain from their bodies; that while waiting for their horses to dry, said Gremillion boys, at the request of some of the dippers, resaddled their horses and went in search of a cow of some third person which had escaped from the vat pen; that said cow was driven back and into the pen, and thereafter Field Gremillion turned his horse to return home "and that the said horse in passing from near the dipping vat gate to the graveled road which leads to Pineville, for some unaccountable and unforeseen reason, as he passed by where the plaintiff stood, kicked out and struck plaintiff's left leg with his rear foot."

It is further alleged that the unfortunate accident was the result of an unforeseeable occurrence and act on the part of said horse and, "insofar as these defendants are concerned, could not by any reasonable act on their part have been avoided."

In the alternative, it is alleged that plaintiff was negligent in standing too close to the gate of the dipping vat pen and in not keeping the proper lookout and moving or protecting himself from animals going into and out of said pen; that he stood approximately between said gate and the only public road which leads to or by said vat, which is approximately 50 yards from the entrance gate of the vat pen; and that his negligence in these respects contributed to the accident and bars recovery by him.

Appellee prays for an increase in the judgment to $10,300, while appellants, in the alternative, urge us to reduce same to $2,000.

Appellants' ingenuous counsel propounds correctly the paramount question in the case:

"Since there is no evidence in this record other than that the horse involved was a gentle and peaceable animal and had never been known to kick or attempt to injure anyone previously, the only possible ground upon which the plaintiff could hope to recover any damages here is that young Gremillion at the time, or just preceding the time this horse kicked Mr. Matthews, was riding or handling the horse in an unreasonable, imprudent and negligent manner, and that some act of Mr. Gremillion at that time was the moving proximate cause of the horse suddenly and unexpectedly kicking out as it did and injuring Mr. Matthews."

The record abundantly establishes the qualities of the mare to have been as they are described in this quotation from counsels' brief. Notwithstanding this, a horse possessing such tractable qualities may be so handled and directed by its rider as to degenerate into an agency for harm and injury, although left to its own volition it would willfully do no harm to persons. In such circumstances, the general rule applicable to vicious animals has no relevancy. Counsel of both sides extensively discuss and quote from decisions involving this principle.

The dipping vat and attached pens are 50 yards from and parallel to a graveled highway leading from Pineville to Marksville. Dipped stock are detained for a few minutes in the east pen to allow the solution to drip and run back into the vat. Stock intended to be dipped are driven into the next pen to the west through a gate on its east side into which pen opens the chute leading into the vat on the north side of the pen. Many hundred head of cattle and horses

were dipped every fourteen days at this vat while the federal and state crusade to rid the country of the Texas fever tick was in progress. Early on the morning of the accident, Field V. Gremillion, Jr., and his cousin, Ben Gremillion, each rode a horse owned by the widow and heirs of Dr. Gremillion, to the vat. These were dipped promptly on arrival and then led outside of the enclosure to dry. After the lapse of a few minutes, some one announced that a yearling had escaped from the vat pen, and the two Gremillions at once resaddled their horses and went in search of the refractory animal. She was soon found and driven hastily back toward the pen. At this time there were assembled in the opening between the pens and the highway scores of cattle, mules, and horses waiting to be dipped, and possibly fifty or more stock owners and others. In order to force the yearling through the gate into the vat pen, Ben Gremillion took a position a short distance west of the gate, while Field pursued it from behind and slightly to the east of a perpendicular line extending south from the gate. Plaintiff was facing the pens, slightly east of and thirty feet from the gate, between the Gremillions. The testimony is quite convincing that notwithstanding the rather crowded condition of the locus, Field drove his horse rapidly through the throng in his zeal to force the yearling again into the pen, and succeeded. Whether his mare kicked plaintiff as she was suddenly turned from the gate toward him, or whether she did so as she was quickly reined away from him after being rushed toward his position in chasing the yearling, the record is not clear. However, the testimony in the case leaves practically no room for doubt that plaintiff was kicked simultaneously with the whirling of the mare from near him. When injured plaintiff was standing on a knoll of earth close to a trail leading from the east end of the vat inclosure to the graveled highway. He was holding his own mule and one of a neighbor, and had occupied that position since arriving on the ground. He had a right to be there. His position was about thirty feet from the gate to the pen. The right of peremption appears to have been recognized, aside from which there seems to have been no fixed system regulating the order of dipping. The record disproves that neither Gremillion raced his steed over the grounds and through the crowd for the pleasure of doing so. We are convinced that practically all, if not all, the riding they

did on this occasion was done in the effort to bring back and repen the yearling. Field was not using spurs.

It appears that to expedite dipping at this vat, stock owners voluntarily assisted each other. By a sort of mass effort stock were held on the ground and, as a rule, were driven into the vat pen in an orderly manner. It is necessary, however, to employ horses in rounding up and holding some horned cattle. When one breaks the drove or escapes from the pen, it may only be subdued and brought back by men on horseback. But this necessity does not warrant the running of such cattle on horses through the assembled crowds of persons and stock. The use of ropes and the assistance of footmen, after a recalcitrant animal has been brought back to the locus, would seem the safer and more sensible means to adopt to insure repenning.

Plaintiff's version of the accident is as follows:

" * * * young Gremillion, I noticed, I know one time passed by and I rather think made the second round behind me, but couldn't swear to the second. In the meantime he appeared from my side where I still thought nothing of it; after standing a while young Gremillion comes back riding his horse where there was I would say 8 or 10 feet vacancy between me and any of the crowd, the way I was standing, to the left side of me, and as though he was going to pass me, but instead he reined the horse in directly behind me; thinking that perhaps he would strike me I hailed him, asked him not to run over me; he reined his horse to the left, stopping with its heels within a few feet of me; before I had time to speak or say anything I notice him reach back with his left foot and touch the animal in the left flank, no sooner done than I was kicked over * * *."

In substance, though varying in immaterial details, plaintiff's version of the accident is corroborated by two or three other witnesses whose credibility does not appear to be seriously affected by anything in the record. Young Gremillion, in giving his version of the immediate facts of the accident, testified as follows:

"Q. Then as the cow was driven into the entrance pen, what happened after that? A. Well, I was quite close to the gate at the time, driving the cow in and I turned my horse around and started for the road that leads to the Marksville road and as I

got about on a line with him the horse wheeled around and kicked out his foot. * * *

"Q. Did you kick the horse in the flank or urge him on or anything of that type? A. Well, it's only natural when you ride a horse a great deal to start him off; I didn't kick him in the flanks, I may have kicked him in the sides.

"Q. I suppose then you kind of kicked him on the side where your stirrup is, is that what you ordinarily do when you want to urge the horse on? A. Yes, that's natural."

Ben Gremillion says. he saw the accident but denies that Field goaded the animal, as was testified to by the other witnesses and as was virtually admitted by Field himself.

■ From this testimony, we reach the conclusion that the immediate cause of the mare's kicking was that young Gremillion suddenly pounded one or both of her sides or flanks with his foot or feet in or without the stirrups simultaneously with his effort to change her course by forcibly pulling on the bridle rein. The animal had just been soused in an arsenic solution strong enough to kill ticks and, before entirely passing from the effects of this experience, was ridden at rapid gaits in pursuit of the escaped yearling. The even tenor of her kindly disposition was evidently disturbed and, in such circumstances, it is no surprise to persons acquainted with the traits of the horse family that she did kick. Under such conditions, a young and vigorous horse will often lunge forwards, rear up, or even pitch the rider off. Amiability of disposition does not serve as a safe guarantee against violent movements. In defense or offense, the horse's heels are relied on as its most forceful weapon. They are put in motion almost involuntarily in cases of defense, when quickness of action is deemed necessary to immediate safety or relief. In the present case, should it have been possible to interpret the thoughts of the mare, it would not be surprising to learn that she really kicked at plaintiff because she believed him to be the one who applied physical force to her. The close proximity of her position to him made it possible for her offensive action to cause injury. This position was not due to her own volition but to her master's. It was he who rode her so close to plaintiff, and it was he who unnecessarily did that which provoked her to wrath, so to speak. The kicking was not the proximate cause of the injury. That cause was the act of the rider which provoked the kicking.

We think the case of Trenchard v. New Orleans Railway & Light Co., 123 La. 36, 48 So. 575, fairly well supports our reasoning. There, the owner left unhitched on the public steet of the city a very gentle horse, attached to a wagon. The horse became frightened and. ran away. Plaintiff's husband, a passenger on defendant's street car, died from injuries caused him when the wagon collided therewith. The owner of the wagon was held responsible for the results of the collision. His negligence in leaving the horse unhitched was the proximate cause of the accident, in that it was thereby made possible for the horse to run away. The negligence of the owner was deemed to have been continuous. The intervening causes, producing the horse's fright, were considered secondary in determining liability. The fact that the horse was quiet and had daily been left unhitched while attached to the wagon, with no untoward results, did not shield the owner from liability. Damonte v. Patton, 118 La. 530, 43 So. 153, 154, 8 L.R.A.(N.S.) 209, 118 Am.St.Rep. 384, 10 Ann.Cas. 862.

Article 2321 of the Civil Code in part reads as follows:

"The owner of an animal is answerable for the damage he has caused."

■ The owner of any sort of animal, under this article, would be responsible in damages for injuries done by it to person or property. It was evidently not intended to have that effect, and the Supreme Court over sixty-five years ago so construed it. As regards nonvicious animals, to hold the owner responsible for their wrongs, it must be shown that he was guilty of some degree of negligence or fault as a contributing cause of the injury. Shawhan v. Clarke, 24 La.Ann. 390.

The fault or negligence referred to need not be of the strongest sort. In the Damonte Case, supra, the court made this very plain. It said:

"The law is 'that the owner of an animal is answerable for damage he has caused' (Civ.Code, art. 2321); and the presumption is that the owner of the animal is in fault, and the burden is on him to show that he was without the slightest fault and did all that was possible to prevent the injury. Bentz v. Page, 115 La. 560, 39 So. 599. There can be no escape from the conclusion that the driver was in fault in leaving the

horse loose in the street while he was chasing his hat."

This principle is reaffirmed in Martinez v. Bernhard, 106 La. 368, 30 So. 901, 55 L. R.A. 671, 87 Am.St.Rep. 306, and also in Mercer v. Marston, 3 La.App. 97, a decision of this court wherein the late Judge Carver was the organ. In this erudite opinion Judge Carver extensively discussed and quoted from authorities of our own state and also of the common law and of France. It was held therein that:

"Under Articles 2315, 2316 and 2321 of the Civil Code the owner of an animal is responsible for the damage it causes if he is guilty of the slightest negligence or fault, but may rebut the presumption of negligence by contrary proof."

We are sure the plea of contributory negligence is without merit. Plaintiff had a right to be where he was when hurt. He had been there waiting for an hour or more. He was doing no more or less than was being done by scores of others there assembled. No duty devolved upon him to shift positions while encumbered with the mules, to make way for those who were imprudently and negligently running stock through the crowd. He was keeping a fairly efficient lookout. This is reflected from his action when he suddenly discovered the mare dangerously near him. He threw up his hands and protested to the rider.

When injured plaintiff was sixty-two years old. He was a quarter-cropper and worked one mule. He was renting a farm of 20 acres of hill land and produced corn and cotton thereon. He is a widower and has no dependents. He suffered much pain from the fracture for about forty days and was forced to stay in the hospital for four months. At the date of trial, he was totally disabled to do work of any character. His wound was of an aggravated nature, but we see no reason why it should not ultimately heal and the use of the leg be restored to him. The doctors, as so often deplorably happens, do not agree as to the duration of the disability. The patient's age militates against quick recovery. We know that fractures of this character do eventually heal if intelligently and skillfully treated.

Plaintiff's life expectancy is not more than ten or twelve years. He generally produced a few bales of cotton and some corn. Weather conditions affect production. The uncertainty of profit in farming is too well known to require comment or proof. The physicians' bills for treating plaintiff amount to $300.

We repeat here what courts have so often said in cases of this character. No fixed rule can possibly be adopted or followed in the determination of the quantum of damages. The facts of no two cases are identical. After a very close study of this record, we are convinced that the lower court's award is too much. We think $4,300 adequate.

For the reasons herein assigned, the judgment appealed from is reduced to $4,300, and as thus reduced and amended, said judgment is affirmed with costs.