57 So.2d 251 (1952)
RAZIANO
v.
T. J. JAMES & CO., Inc.
No. 19801.
Court of Appeal of Louisiana, Orleans.
March 3, 1952.
Rehearing Denied March 31, 1952.
*252 May & Carrere, New Orleans, for appellant.
Stanley A. Baron, New Orleans, for appellee.
REGAN, Judge.
Plaintiff, Nick Raziano, Jr., the owner and operator of a 1940 Studebaker automobile, instituted this suit against defendant, T. J. James & Company, Inc., endeavoring to recover the sum of $10,000 for personal injuries and property damage incurred by him as the result of colliding with defendant's mule on the night of June 4, 1943, at about 9:40 p. m., in the Airline Highway, while driving at a normal speed in the direction of the City of New Orleans, and at a point midway between the town of Kenner and the City of Harahan, Louisiana.
Defendant answered and admitted the occurrence of the accident, but denied that it was guilty of any negligence in the premises, and further averred that plaintiff was driving his automobile within three feet of the neutral ground which bisects the highway, at an excessive rate of speed, which made it impossible for plaintiff to exercise proper control of his car, in violation of Rules 3, 4 and 5 of Title 2, Section 3 of Act *253 286 of 1938, LSA-R.S. 32:221, 32:227 et seq., which is the Highway Regulatory Act; that defendant took every reasonable precaution, required by law or common prudence to preclude the possibility that the mule would escape through the corral maintained by defendant for the purpose of confining its stock.
Defendant, in the alternative, pleads the contributory negligence of plaintiff which, in substance, is the same as set forth above.
From a judgment in favor of plaintiff in the amount of $5,000, defendant prosecutes this appeal. Plaintiff has answered the appeal asking that the judgment be increased to the amount prayed for.
The accident occurred on June 4, 1943. The lay testimony was taken during the trial which occurred on May 12, 1948. The medical testimony of Drs. E. F. Salerno and George C. Battalora was taken in the offices of Dr. Battalora on June 15, 1950 and judgment was rendered in May, 1951.
The record reveals that plaintiff testified he was driving his automobile about thirty miles per hour in the Airline Highway about three feet removed from the neutral ground, in the direction of the City of New Orleans; when he was about midway between Kenner and Harahan "a mule" suddenly emerged from the obscurity of planted shrubbery on the neutral ground and into the path of his car as he was preparing to pass an automobile preceding his own. The mule was struck by the left front section of the car and pushed about ten or fifteen feet forward and the car moved to the right about twenty-five feet from the point of impact. In consequence of the unexpected collision between the animal and the car, plaintiff's torso was thrust violently against the steering wheel and dashboard, resulting immediately in his inability "to catch my breath" and ultimately in the following serious injuries. "The sternum bone was crushed backwards, with cartal narrowing on the right side of the chest, together with a sacroiliac strain to the back" which necessitated strapping for a period of seven months.
Plaintiff obviously relied upon the physical facts to substantiate his version of the accident because he did not produce any eye witnesses to corroborate his testimony, although he stated that a car was following him which stopped after the accident and he secured the names of two witnesses and they would testify "if they have to * *."
Defendant offered in evidence the testimony of Joseph E. Lacey, its Superintendent of construction, who stated that a stable and corral was maintained to care for the "work stock" during construction of Moisant Airport. The corral, which was adjacent to the Airline Highway, was enclosed by virtue of the erection of a fence constructed of 4" × 4" wooden posts of irregular heights, spaced eight feet apart and placed a depth of three feet in the ground, with 8" × 1½" green hardwood planks nailed thereto, because wire was unavailable due to "war shortages", but that, in his opinion, it was stronger than a barbed wire fence. He had observed the mule often and he was of good disposition and well behaved; that prior to June 4, 1943 the mule had never broken out of the enclosure.
Defendant also offered in evidence the testimony of Nathaniel ("Chickaboo") Washington, a Negro, who stated that he was a corral man in charge of the livestock consisting of six or eight horses and mules; that the corral was enclosed by a fence constructed of wooden posts and boards; when the animals were returned in the evening to the corral they were "fed, watered and shut up" and then he left and returned the next morning; he remembers distinctly that he locked them up securely the night of the accident but when he arrived at work the next morning, after the accident, two of the fence boards had been broken which he was sure had not occurred before he left the corral the night before. Upon being interrogated relative to the "mule's disposition", Washington said: "he was a mule that had plenty of life. He was very skittish", but that he had never had any trouble with him; that in addition to the mule that was killed by virtue of the accident, one other mule had escaped from the corral that same night which returned the next morning.
Plaintiff contends that defendant's negligence was the proximate cause of the accident *254 which he enumerates as follows: (a) that on the night of the accident defendant's mule was roaming at large contrary to and in violation of the livestock ordinance, adopted by the Police Jury of the Parish of Jefferson on May 12, 1926; (b) in not having the mule properly fenced in; (c) in not exercising the proper precaution especially in view of the fact that defendant possessed knowledge of the mule's propensities as evidenced by Washington's testimony that "he was a mule that had plenty of life. He was very skittish."
Defendant, in opposition thereto, maintains that it was not guilty of any negligence in the premises; that the "ordinance" referred to by plaintiff, if it requires the erection of a "barbed-wire" fence is "unconstitutional" and, in the alternative, pleads the contributory negligence of plaintiff.
The only question posed for our consideration is one both of fact and law, and that is, was the defendant guilty of any negligence and, if so, was this negligence the proximate cause of the accident.
Under the rules which emerged from the common law the owner of domestic animals possessed a duty which was absolute to keep them contained within his own premises and he was strictly liable for their trespass on another's land if he failed to do so. "Where my beasts of their own wrong without my will and knowledge break another's close I shall be punished, for I am the trespasser with my beasts." 12 Hen. VII, Keilway 3b Accord; McKee v. Trisler, 1924, 311 Ill. 536, 143 N.E. 69, 33 A.L.R. 1298; Drew v. Gross, 1925, 112 Ohio St. 485, 147 N.E. 757; Fox v. Koehnig, 1926, 190 Wis. 528, 209 N.W. 708, 49 A.L.R. 903. Therefore, the obligation rested on the owner of domestic animals to fence his stock in and no burden was imposed upon his neighbor to keep them out.
The State of Louisiana has enacted no general statute forbidding the owners from indulging in the custom of allowing their stock to roam at large, but vests this power in the Police Juries of the respective parishes who may enact ordinances to accomplish the desired result. In this connection Article 2321 of the Louisiana Civil Code of 1870 is significant. It provides: "The owner of an animal is answerable for the damage he has caused * * *."
It would, therefore, appear per se that Article 2321 would impose an absolute liability upon the owner of an animal, irrespective of the existence of any ordinance; however, that article has been interpreted as subject to the negligence or fault requirements of Articles 2315 and 2316 of the Civil Code. Tillman v. Cook, La.App., 1941, 3 So.2d 230. This interpretation is enunciated in Tripani v. Meraux, 1936, 184 La. 66, 165 So. 453, 455, where in the opinion it is stated "although article 2321 of the Civil Code declares, unqualifiedly, that the owner of an animal is answerable for the damage he has done, the interpretation which has been put upon this article, consistently, by this court, is that the owner of an animal is liable for damages done by the animal only in cases where the owner was guilty of some fault or negligence in his ownership or possession of the animal." A fortiori, the burden of proof is on the owner to show that he was without the slightest fault and did all that was possible to prevent the injury, Bentz v. Page, 115 La. 560, 39 So. 599; Damonte v. Patton, 1907, 118 La. 530, 43 So. 153, 8 L.R.A.,N.S., 209, 118 Am.St. 384, 10 Ann.Cas. 862; Boudreau v. Louviere, La.App., 1938, 178 So. 173. However, the presumption of fault is a rebuttable one. Mercer v. Marston, 1923, 3 La.App. 97; Matthews v. Gremillion, La.App., 1937, 174 So. 703.
Several generations ago the courts of this Nation rejected the common law rule of strict liability growing out of animal trespasses; but as various states of this Union have become more populated and industrialized, the tendency has been to restore the rule of strict liability, either by state statute or local ordinance, for the reason that the need of such a law in the community outweighs the economic burden imposed upon the owners of animals.
In view of the foregoing premise let us consider the conclusions reached in the Louisiana cases where an ordinance restrains *255 the owner from indulging in the custom of allowing his cattle to roam at large.
In Williams v. Windham, 3 La.App. 127, the owner was held liable for the damage done by his domestic animal engaged in a trespass.
In Cristiana v. Sievers, 15 La.App. 579, 132 So. 375, the court reached the conclusion that the defendant was liable and was of the opinion that it was negligence not to keep a fence in the proper state of repair or to carelessly permit the cattle to roam.
In Kraak v. Gruntz, 17 La.App. 179, 135 So. 122, this theorem of liability was expanded to encompass the factual situation where stock broke through the fence and damaged another's property.
In Boudreau v. Louviere, supra, the defendant's mule had entered the highway and therein caused plaintiff to be injured. The court was of the opinion that the defendant was at fault because a local ordinance prohibited owners from permitting their stock to roam at large; however, in Abraham v. Castille, La.App., 158 So. 650, the court was of the opinion that the owner of the animal was not at fault when, due to an act of God or other unforeseeable agency, his animal escaped from an enclosure and ran into the highway and caused damage.
In the final analysis, it, therefore, appears that the existence of an ordinance places an obligation upon the owner to contain his stock within a properly constructed enclosure.
In the instant case the negligence charged against the defendant is that it permitted its mule to escape from the corral, located adjacent to the Airline Highway and roam upon the highway in derogation of the Police Jury Ordinance of the Parish of Jefferson. A copy of that ordinance has been introduced in evidence which reveals that it is the usual form of stock law under which it is made "unlawful for any person to allow any mule, horse, sheep or livestock of any description, to roam on the public streets or highways * * *." The effect of the ordinance is, of course, to require owners of stock or cattle to contain them within a proper enclosure.
The record reflects that the defendant did have a fence enclosing the corral in which the mules were contained, constructed of 4" × 4" wooden posts of irregular heights, spaced eight feet apart and three feet deep in the ground with 8" × 1½" green hardwood planks nailed thereto. There is no testimony in the record with respect to the height of the fence or the number of 8" × 1½" planks attached thereto, but the evidence preponderates to the effect and we believe it is conceded by the defendant, that one of the mules which escaped from the corral on the night of the accident, broke two of the fence boards, and thus escaped and the presumption, therefore, is that there was some fault in the lumber used or in the manner in which the fence was constructed.
The defendant laboriously endeavored to rebut this presumption through the testimony of Lacey, its superintendent of construction, and Washington, its corral man, who, as we have related hereinabove, testified as to the general good construction of the fence, however, the fact remains that the fence was broken by one, or both of the mules which did escape through the break in the fence, one of which entered the highway on the night of the accident and caused the damage to plaintiff, which is the subject matter of this litigation. A "snapshot" of the fence, which appears in the record, indicates a fence which, in our opinion was not substantial enough to confine a mule, whose propensities were known by defendant's employee, Washington, to be "a mule who had plenty of life. He was very skittish." Therefore, the defendant failed to rebut the presumption that the corral fence was improperly constructed or constructed of defective or inadequate material.
The violation of an ordinance is of no importance in the final analysis of a tort action unless there is a causal connection between its violation and the resulting accident. In the instant case there is a definite and clear cut causal connection between the violation of the stock law ordinance and the resulting injuries to plaintiff. *256 The ordinance sets forth that it shall be unlawful for any person to allow any mule, etc. to roam on the public streets or highways. The record indicates this corral, in which the mule was confined, was erected adjacent to the Airline Highway where the owner could reasonably anticipate that if the stock escaped therefrom, they could roam into the highway at night, as the mule actually did in this case, and cause serious injuries to motorists lawfully operating therein.
There is no merit whatsoever in defendant's attack upon the ordinance's unconstitutionality.
In view of the fact that we have concluded that defendant's negligence was the proximate cause of the accident, it remains for us to consider whether plaintiff was guilty of contributory negligence. This plea, which we have referred to hereinabove, avers that the plaintiff was driving his automobile within three feet of the neutral ground which bisects the Airline Highway, at an excessive rate of speed, which made it impossible for him to exercise proper control of his car in order that he could stop within the range of his headlights, in violation of Act 286 of 1938, which is the Highway Regulatory Act.
Plaintiff testified that he was driving his automobile about thirty miles per hour in the Airline Highway about three feet removed from the neutral ground and when he was about midway between Kenner and Harahan, "a mule" suddenly emerged from the obscurity of planted shrubbery on the neutral ground and into the path of his car as he was preparing to pass an automobile preceding his own. The foregoing testimony was not rebutted by the defendant and a casual reading of the act obviously relieves plaintiff of the foregoing charges of negligence. He was not driving at an excessive rate of speed and did not have an opportunity to see the mule in sufficient time to exercise such precaution as would have averted the accident. It was also permissible for plaintiff to drive his car within three feet of the neutral ground especially since he was preparing to overtake and pass another vehicle.
The medical testimony reveals that on the day following the accident plaintiff was treated by Dr. Geismar and failing to obtain any relief from him, he consulted his family physician, Dr. E. F. Salerno, who testified that he examined the plaintiff on June 14, 1943, ten days after the accident; the plaintiff complained to him that he was suffering excruciating pain in the chest and lower regions of his back and was experiencing great difficulty in breathing. He was referred to Dr. Tracy T. Gately for x-ray examinations and he "found that his zyphoid processwhich is the lower part of the sternumwas displaced backwards about one quarter of an inch", "which may be due to injury or may be congenital." Dr. Salerno said that having examined plaintiff on previous occasions for ordinary maladies that the congenital matter could be eliminated and that the condition was due to injury. Thereafter, plaintiff continued to complain of pain in the chest and back and in August, 1943, he had him re-x-rayed which disclosed the same condition which had existed on June 14, 1943. Plaintiff's pain continued to persist and because of the possibility of an internal injury, Dr. Salerno, on November 26, 1943, recommended a "G. I. Series" which, when completed, proved negative for internal abdominal injury. In March, 1947, he was again x-rayed which reflected "no evidence of bone or joint pathology or injury in the dorsal region. Lumbar spine shows a presence of small Schmorl's nodes at the anterior superior portion of the fourth lumbar body." A sacroiliac belt was then prescribed which afforded no relief. Dr. Salerno said "we baked his back with infra red lights and also employed diathermic treatment" and that "about twice a week he would come in * * *." Plaintiff was treated by Dr. Salerno from June 14, 1943 to March 23, 1947, and then referred to Dr. George C. Battalora.
Dr. Battalora testified he had occasion to examine plaintiff on March 23, 1947, and that at the time his testimony was taken, June 15, 1950, plaintiff was still under his care and observation. He stated that when he first saw plaintiff he was wearing a sacroiliac belt and he referred him to Dr. J. N. Anee, for x-ray examinations, whose report "showed a slight left lateral *257 and interior wedging of the body of the fourth lumbar vertebra, with a crescentic deformity involving the anterior portion of the superior surface of the body of the fourth lumbar vertebra. The disc between the third and fourth lumbar vertebrae was narrowed." It was Dr. Battalora's opinion that plaintiff had "sustained a mild degree compression fracture involving the fourth lumbar vertebra." There was a herniation of the intervertebral disc into the upper portion of the body. Dr. Battalora, therefore, "ordered a heavy type of support and later put him on postural exercises." Plaintiff "reported back at monthly intervals for three months and then at later intervals." In November of 1948, plaintiff was advised to procure a Williams type of back brace. He was then seen by Dr. Battalora at intervals of from one to three months. On January 5, 1950, Dr. Battalora advised plaintiff to consider a fusion operation of the lower back and "the patient would have to wear some external support for a period of from six to eight months following the operation." Dr. Battalora stated that the condition which plaintiff has "causes pain, particularly if you try to do any laborious work"; that he was still wearing "a belt" and he would have to alternate with "his brace" and "his belt" until he has this operation performed. On June 1, 1950 "a new examination was made" and "showed essentially the same findings as mentioned previously." Dr. Battalora was also of the opinion that plaintiff was not malingering; that he possessed a "postural defect"; and there was a very strong probability that this defect was aggravated by the accident.
Plaintiff testified that at the time of the accident he was twenty years of age and prior thereto he was employed by Delta Shipyards as an electric welder earning approximately $340 per month; as a result of the accident he was unable to work for eight months and thereafter only to a limited degree; his "lost wages" amounted to the sum of $2,720; at the time of the trial he owed doctor bills amounting to $305; the damage incurred to his automobile necessitated the expenditure of $225 for the repair thereof; and for "pain and suffering he was entitled to $6,550.00" or a total of $9,800.00 for personal injuries and property damage. Plaintiff sued for $10,000, however, the figures contained in the itemization thereof add up to the sum of $9,800.
The court, a qua, awarded plaintiff the sum of $5,000 for personal injuries and property damage. It is our opinion that this amount is inadequate considering all of the circumstances and should be increased to the sum of $7,500, which we believe to be adequate only insofar as money may make it so.
For the reasons assigned the judgment appealed from is amended by increasing the amount thereof from $5,000 to $7,500 and as thus amended, it is affirmed.
Amended and affirmed.