LOTTINGER, Judge.
This is a tort action which arose as a result of a collision between an automobile owned and operated by the plaintiff, George Pitcher, Jr., and a horse belonging to the defendant, Woodson T. Callihan, which occurred in the Parish of East Baton Rouge, Louisiana, on May 19, 1963.
The record reflects that while returning from new Orleans to Baton Rouge on May 19, 1963, at about 8:30 P.M., the plaintiff, driving a 1953 Chevrolet automobile at a speed of about 60 miles per hour in a southwesterly direction on Louisiana Highway 427, about one-half mile west of Kleinpeter in East Baton Rouge Parish, Louisiana, struck a horse owned by the defendant, Woodson T. Callihan, who was insured under a liability insurance policy issued by the defendant, Audubon Insurance Company. The horse approached the highway from the plaintiff’s left, crossed the highway right of way, the left shoulder of the road, and then proceeded across the left traffic lane at which time the head of the horse was struck by the left front fender of the plaintiff’s automobile, which was traveling in its own proper right hand lane of traffic.
It was stipulated by counsel for both parties that at the time and place of the accident there was a Stock Law in effect in East Baton Rouge Parish, Louisiana, and that that Stock Law affected the highway upon which the accident occurred.
In his petition, the plaintiff alleges various personal injuries sustained as a result of the collision, consisting principally of facial lacerations and injuries to both eyes.
After a trial on the merits, the Trial Judge rendered judgment in favor of the *835 ■defendants and dismissed the plaintiff’s suit at his cost. It is from this judgment that the plaintiff has appealed to this Court.
While the appellant has assigned no specific assignments of error, we believe it apparent that this appeal is based upon the Trial Judge’s alleged error in finding that the defendant, Woodson T. Callihan, had “taken every precaution expected of a reasonable, prudent man to prevent this horse from leaving its pasture and coming ■onto the highway”, and in finding that the defendant, Callihan, “took every precaution required of the owner of livestock, and that he has freed himself from any charge of negligence in connection with this case.”
This burden imposed upon the defendant to free himself from negligence is imposed in instances where, as in the present case, an animal belonging to a defendant is struck upon a “Stock Law Highway”, as was the highway in this instance. In the case of Kupper v. Connolly, La.App., 153 So.2d 915, Judge Ellis of this Court, in dealing with a similar case, said:
“The lower court correctly stated the law of Louisiana as placing the burden of proving freedom from negligence on the owner of the cow where, as in the present case, the cow is struck upon a 'Stock Law Highway,’ such as U. S. Highway 51. The law in such a case is fully discussed in Raziano v. T. J. James and Co., La.App., 57 So.2d 251, Parker v. Young, La.App., 122 So.2d 699; and very recently, by our brethren of the Third Circuit in Colomb v. McDonald, La.App., 131 So.2d 84.”
Let us now consider whether or not Mr. Callihan did in fact prove himself free from negligence. Mr. Callihan’s testimony which is uncontradicted, is to the effect that on the date of the accident, which was a Sunday, he had gone to church at 7:00 P.M. and that prior thereto he had been outside cleaning the yard for most of the afternoon. He did not know how the horse got out, and did say that he was in the yard around the gates at all times on Sunday and that all of the gates were closed. The enclosure in which the horse was contained is a four strand barbed wire fence interspersed with several wooden gates and one metal gate. The metal gate, which is the one from which the horse apparently escaped, is an aluminum garden gate about 4 to 4 and feet wide which was hinged from a post on an ell shaped bolt, there being slots in the gate itself that fit over the angle of the bolt. Mr. Callihan testified that after this gate was initially erected it was determined that the latch did not operate properly, and he immediately wired the gate to the post so that it could not be opened at any time. The record discloses that the gate was discovered off of the hinges on the side opposite that from which it was wired closed and that the horse apparently escaped in this manner. This could have only been accomplished by the gate having been lifted off of the hinges. Mr. Callihan testified that before going to church, he was working on the side of the yard on which the metal gate was located and that he was within 8 to 10 feet of the gate a good portion of the afternoon, and that the gate was definitely not open when he left to go to church, tie testified that when he returned from church and saw that the horse had been involved in an accident, he went immediately to the enclosure where the horse had been kept to see if any of the other horses had escaped and found that the gate had been lifted from its hinges and was partially open. It was still wired closed on the side opposite from the hinges. He testified that at no time had he ever permitted his animals to roam freely upon the highways, that he had kept them under fence at all times, and had never tied or anchored his horses upon the public highway for grazing purposes. Mr. Callihan also testified that he periodically checks his fences for holes and makes any repairs that might become necessary. He also testified that he spends *836 a large portion of his time in this enclosure and he checks fences most of the time, even those which adjoin him that are not on his property. His testimony is to the effect that none of his fences were in a state of disrepair at the time of the accident, and that his gates at all times were kept securely closed, and that none of his animals had ever escaped prior to this incident.
Mrs. Callihan, the defendant’s wife, testified that when her husband left to go to church she was in the house watching television. She further testified that she at no time opened any of the gates to any of the pastures, and had not even gone outside of the house during the entire time that her husband was at church. She further testified that she was outside with her husband at about 6:45 P.M. and that at that time all of the gates including that from which the horse apparently escaped, were securely fastened. She corroborated her husband’s testimony to the effect that all of the fences on the property were in good repair, that her husband never permitted his horses to roam at large upon the highway, and that he never tied or anchored the horses upon the public highway for grazing purposes.
In the light of Mr. Callihan’s corroborated uncontradicted testimony to the effect that he periodically inspected his fences and gates, that he never permitted his horses to run at large upon the highway, or to graze thereon; and that he periodically repaired as well as inspected all areas in the fences or gates which required it, indicate that the degree of care exercised by Mr. Callihan in connection with the keeping of his animals was certainly that of a reasonably prudent man. Indeed, we are impressed with that portion of Mr. Callihan’s testimony relative to his having wired tlie gate in question closed after he determined that the latch with which it was equipped did not always function properly. This indicates to us that the degree of care exercised by Mr. Callihan with reference to the security and containment of the animals within the fenced area was quite high indeed. We therefore believe that the ruling of the Trial Judge to the effect that the defendant in this instance has proved himself free from negligence was correct.
Accordingly, the judgment of the Trial Court is affirmed, the appellant to pay all costs of this appeal.
Judgment affirmed.