142 So.2d 838 (1962)
Claude B. KENNEDY, Jr., et al., Plaintiffs-Appellants,
v.
L. S. FRIERSON, Jr., Defendant-Appellee.
No. 9740.
Court of Appeal of Louisiana, Second Circuit.
June 14, 1962.
Rehearing Denied July 5, 1962.
*839 Lynch & Rogers, Shreveport, for plaintiffs-appellants.
Bodenheimer, Looney, Richie & Jones, Shreveport, for Southern Insurance Co., intervenor-appellant.
Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, for appellee.
Before HARDY, GLADNEY, AYRES, and BOLIN, JJ.
HARDY, Judge.
This is an action, ex delicto, by plaintiffs, husband and wife, who seek recovery of damages in the nature of personal injuries, expenses with respect thereto, and for the death of their infant son. The named defendant is L. S. Frierson, Jr., owner and operator of what is known as Ravenswood Plantation in Caddo Parish, Louisiana. Plaintiffs' suit results from a collision between a Volkswagen automobile owned and operated by the plaintiff husband and a white-faced Hereford bull approximately four years of age, owned by the defendant. The accident occurred on what is known as the Ellerbe Road, a public highway in Caddo Parish, at a point where defendant's plantation is adjacent to the said highway. As grounds for their action, plaintiffs alleged that the Hereford bull was running at large on the parish highway, in violation of the provisions of a Police Jury ordinance of said parish, due to the negligence of defendant to properly construct and maintain an enclosure within which the animal was customarily confined. Defendant denied negligence on his part and further asserted contributory negligence against plaintiffs.
In these proceedings, by proper petition, Southern Insurance Company, collision insurer of plaintiff's automobile, intervened as subrogee of its insured, praying for judgment against defendant to the extent of its payment of collision damage. By stipulation during trial the accepted value of plaintiff's car at the time of the accident was fixed at $1,400.00, and intervenor's claim, after reduction by the sum of $100.00 representing the deductible provision of the policy and the salvage value of $475.00, was established in the amount of $825.00.
From a judgment, rendered without assignment of written reasons, rejecting their demands the plaintiffs and intervenor prosecute this appeal.
The accident occurred after dark at or about 8:30 P. M. on June 4, 1960. Plaintiff husband, accompanied by his wife seated on the right-hand side of the front seat, and his infant son, almost eleven months of age, who was being held in his mother's lap, was driving his Volkswagen automobile south on the Ellerbe Road in his proper lane of travel at a speed of approximately 45 miles per hour; after meeting and passing a northbound pickup truck driven by Mr. D. W. Hollowell, accompanied by J. D. Herring, a passenger therein, at which time both vehicles had dimmed their lights, plaintiff's car had proceeded only a short distance when he observed the Hereford bull in his lane of travel at a time when he was unable to prevent a collision. The Volkswagen, still approximately in the center of the west lane of the highway, struck the animal, whose horns were impaled in the windshield or hood of the automobile, and came to a stop within a few feet. The animal, which had been immediately killed by the force of the impact, was still caught upon the left front portion of plaintiff's car. As the result of the collision plaintiffs' son Claude B. Kennedy, III, was fatally injured and death resulted within about three hours. Plaintiff husband was injured about the face, particularly in the area of the left eye, and plaintiff wife sustained numerous serious and painful injuries which will be hereinafter detailed.
We find little difference of opinion with respect to the legal principles which apply *840 to the instant case and the issue presented by this appeal, in our opinion, must turn upon the facts established and the application of the principles of law bearing thereon.
A so-called "no fence ordinance", No. 523 of 1932, adopted by the Caddo Parish Police Jury amending a previously adopted ordinance, No. 107 of 1924, prohibits all domestic animals, horses, mules, cattle, etc.
"* * * from running, roaming, or being at large, or on any of the public highways or commons, or on any private land other than that of the owner of such animals, in the Parish of Caddo; * * *."
There is no question as to the fact that the animal which was involved in the accident was owned by defendant and was roaming at large on a public highway of the Parish of Caddo in violation of the aforesaid ordinance.
Nor is there any question as to the applicability of LSA-C.C. Article 2321 which provides in part:
"The owner of an animal is answerable for the damage he has caused; * * *."
Under our jurisprudence, bulwarked by origins attributed to Roman Law, further supported by French commentators and now firmly imbedded as an established legal principle in Louisiana, the owner of an animal is responsible for damage which it causes if there is any proof of negligence, however slight, on his part. This principle has been enunciated in numerous cases, among which we cite Bentz v. Page, 115 La. 560, 39 So. 599; Damonte v. Patton, 118 La. 530, 43 So. 153, 8 L.R.A.,N.S., 209; Abraham v. Castille (1st Cir., 1935), La. App., 158 So. 650; Boudreau v. Louviere (1st Cir., 1938), La.App., 178 So. 173; Raziano v. T. J. James & Company, Inc. (La.App.Orleans, 1952), 57 So.2d 251; Stinson v. Robinson, et ux. (2d Cir., 1953), La.App., 68 So.2d 806; Thomas v. Wright (2d Cir., 1955), La.App., 75 So.2d 559.
It is equally well established by the above cited cases, and others to the same effect, that where an animal has been the cause of damage, the burden rests upon the owner to exculpate himself of even the slightest degree of negligence.
It is scarcely necessary to observe that the burden placed upon the owner of an animal by these incontrovertibly established legal principles is not insubstantial but requires him to establish, by proof of facts in a given case, his complete freedom from any negligence of even the slightest degree to which might be attributed the action of the owned animal by which damage is caused to another.
In the instant case, in the effort to discharge the burden of proof above noted, the defendant availed himself of the testimony of a large number of witnesses. The first group of these witnesses consisted of neighboring landowners, all of whom were friends or relatives of defendant, and the gist of whose testimony was that they had intimate knowledge, by observation, of the fence enclosing defendant's herd of cattle, consisting of something in excess of 200 head; that the fence was uniformly well constructed and carefully maintained. The second group of witnesses tendered by defendant was composed of a number of his colored farm laborers who were familiar with his property and its enclosures, and some of whom were charged with the responsibility of looking after the cattle and maintaining the fenced enclosure in which they were confined. Finally, both defendant and his wife testified as to the construction and maintenance of the fence enclosing their stock.
We have made the above division of defendant's witnesses into groups for the purpose of a more orderly discussion of the testimony. Examination of the testimony of the first group of witnesses discloses that it was uniformly based upon their observations, principally made from passing up and down the highway adjacent to defendant's plantation and not from any detailed knowledge *841 or first-hand information derived from an inspection of the fence, section by section. We think this comment is appropriate for reasons which should become obvious in connection with facts hereinafter set forth.
The testimony of the second group of witnesses presented by defendant was also uniform as to the construction and maintenance of the fence. However, strangely enough, it is from the testimony of a number of the members of this group, that is, defendant's colored farm employees, that there developed the facts which we think establish negligence on the part of defendant.
Without going into what we regard as irrelevant details as to the construction of defendant's fence, particularly that portion adjacent to the highway, we think it sufficient to comment that the fence was constructed of creosote posts, strung with five strands of tightly drawn barbed wire, and that, with one exception, it was completely adequate for the purpose for which it was designed and was, again with the same exception, properly inspected and maintained.
However, even as a chain is only as strong as its weakest link, so a fence, no matter how properly constructed, how often inspected and how well maintained, is only as strong as its weakest point. The exact location at which defendant's bull, which was the cause of the accident, escaped from the enclosure is conclusively and irrefutably established by the testimony of a number of defendant's witnesses. At one point adjacent to the highway defendant's fence crossed a ravine, or what is referred to in the testimony as a "water-gap", and the five top strands of barbed wire passed over this depression, at the surface level of the land, between two creosote posts located on each side of the gap. For protection in the ravine below the ground level, five additional strands of barbed wire had been originally strung across the depression but without any supporting posts located in the gap. It is definitely established by the testimony of a number of witnesses that the bull escaped from the fenced enclosure by working his way between the lower strands of barbed wire which had become slack, thereby permitting the exit of the animal onto the highway right-of-way. The testimony of these witnesses establishes that hair was found on some of the barbs; that the staples supporting one or two of the lower strands of wire had pulled away; that there were hoof prints and, according to at least one of the witnesses, a well defined trail leading in and out of the fence at this point indicated the frequent passage of cattle. However, it is not necessary, in fixing the location of the animal's escape from the pasture, to rely solely upon the testimony of defendant's employees on this particular point, for it is confirmed by the testimony of his wife, himself and other witnesses. Following the accident there was an appreciable group of peoplesome 20 to 30 in number as estimated by some of the witnessesand an examination of defendant's fence was made in the immediate area with the aid of flashlights. Even under the unfavorable condition of darkness and only with the aid of these lights the slack wires and the point of exit from defendant's enclosed pasture at the water gap was immediately discoverable. The condition was so apparent that defendant immediately ordered the placement of a post driven into the ground in the center of the water gap to which the lower wires were firmly affixed. This repair was effected on the very night of the accident which is the basis of this suit.
By way of rebuttal, plaintiffs introduced the testimony of Mr. and Mrs. R. L. Barrett, who at the time resided on the plantation of Mr. G. A. Frierson, which immediately adjoined that of the defendant. Both of these witnesses testified that on the afternoon of the accident they had observed a bull, a cow and a calf on the right-of-way adjacent to defendant's property and that they had observed cattle roaming at large in the same vicinity on other occasions prior *842 to the occurrence of the accident. Mr. Barrett further testified that he had observed the passage of the Kennedy car on the highway, had noted that its lights suddenly went out and, assuming that some untoward incident had occurred, returned to the location immediately after the occurrence of the accident. This witness also testified that sometime following the accident he accompanied the defendant to the water gap where he personally observed the defective condition of the barbed wire strands and positive evidence that this was the point of escape by the defendant's bull from the enclosed pasture onto the highway.
An attempt was made on behalf of defendant to impeach the testimony of the Barretts by means of surrebuttal which was permitted by the district judge over the objection of counsel for plaintiffs. We make no comment on the propriety of this action inasmuch as the issue has not been raised before this court, and, further, because of the fact that we deem it unimportant. The testimony of defendant on surrebuttal can only be interpreted as denying the fact that Mr. Barrett had specifically accompanied him at the time the examination of the water gap was made following the accident. However, any meaningful effect of this denial is seriously weakened, if not destroyed, by defendant's admission that Mr. Barrett was present; that there was a large crowd of people which he variously estimated at from 20 to 50; that many of them were present at the time he examined the water gap and that Mr. Barrett could have been one of this number.
We have given no great consideration to the testimony of the Barretts which we think has little effect upon the facts of the instant case. In our minds, it is unimportant whether there were cattle on the roadway prior to the accident, and the decisive factor which we have discussed in some detail, is whether the animal which caused the accident escaped from defendant's enclosure by reason of his negligence.
On the basis of the record, we think the following factual conclusions are completely justified:
(1). A weakened section of defendant's pasture fence adjacent to the highway existed at the time of the occurrence of the accident;
(2). This condition was attributable to defendant's failure (a) to properly construct, and (b) to adequately maintain that part of the fence extending from ground level down to the bottom of the water gap.
(3). It was through this weakened portion of the fence that defendant's bull escaped from the pasture;
(4). The bull was roaming on the highway in violation of the prohibition of a Parish ordinance, which action constituted the direct and proximate cause of the accident under consideration.
On the basis of the above factual conclusions and by application of the indisputably established legal principles to which attention has been called in this opinion, supra, it follows that defendant must be found liable for actionable negligence.
We are not unaware of the persuasive force of the argument made by distinguished counsel for defendant, to which we have given careful consideration and particularly to the case of Alfred v. Lee (2nd Cir., 1954), La.App., 71 So.2d 601, which counsel urgently contends is indistinguishable from the instant case. With this observation we cannot agree. In the Alfred case the offending animala muleescaped through the broken wire of a substantially constructed gate, which, according to the opinion of the court, was under the almost daily observation of the defendant and was frequently used by him and members of his family. In the instant case the discovery of the defective condition of the fence across the water gap could and should have been detected by proper inspection. The condition which permitted the escape of the bull was obviously not a matter of overnight *843 occurrence and was due, as we have above attempted to point out, first, to improper construction, and, second, to lack of proper inspection and maintenance.
We find no merit in the plea of contributory negligence charged against plaintiff husband. There is no showing of an unreasonable rate of speed, of failure to maintain control or lack of proper observation. The circumstances and conditions with respect to the actions of the bull, immediately preceding and at the time of the accident, are clearly established by the witnesses, Herring and Hollowell, the occupants of the pickup truck which passed plaintiff's automobile immediately prior to the collision. These details are graphically narrated by the named witnesses. Mr. Herring testified as follows:
"Q. Would you describe to the Court what you saw about that time on the Ellerbe Road?
"A. Well, we were coming along at a pretty pert rate of speed and saw this bull running down the road, just trotting along. There was a nigger along there with him. The bull was just in front of the nigger, 20 or 30 feet, and we thought the nigger was driving the bull, and so we naturally had to slow down, and, well, we stopped, and then he put it into first gear and just trailed along behind this bull I would say 100 or maybe 200 yards before he
"Q. Where was the bull in relation to the road at this time?
"A. Right in the middle of the road.
"Q. In front of your truck?
"A. Yes, sir, right in front of the trunk.
"Q. All right, sir?
"A. So we trailed along there I would say 150 to 200 yards behind the bull and then he turned to our right and went down in the road ditch, so we were just easing along and noticed the lights of a car coming and so I asked Mr. Hollowell to dim his lights two or three times and maybe this man would slow down and I was afraid he would come along and the bull would jump up back on the highway and he would probably have an accident, so in the meantime when the man got about even with us I just turned in the seat and was looking straight out the back glass of the truck
"Q. At this time you had passed the bull on the road?
"A. Yes, sir. And that was when I saw the accident.
"Q. Where was the bull when you passed it?
"A. The bull had turned out to our right and went in the road ditch there off the highway.
"Q. You turned around and looked out the rear window of the truck, is that correct?
"A. Yes, sir.
"Q. Did you actually see the automobile strike the bull?
"A. I actually saw it.
"Q. Describe exactly what you saw?
"A. Well, when the man passed us, Mr. Kennedy, I believe was the man's name, and he didn't go, I would venture to sayI didn't step it off or measure itbut I would say 100 yards and saw this bull run out of the grass right up in front of him, and Mr. Kennedy cut his car to the left and when he cut to the left the bull whirled back to the left right in front of his car. It was just impossible for him to miss it. And I was looking at it just like looking at you."
* * * * * *
"Q. Mr. Herring, I think you stated that there was high grass growing in *844 the ditch along the side of the road, is that correct?
"A. Yes, sir.
"Q. When the bull ran out of the roadway which way did he go, to your right or left?
"A. He went to our right.
"Q. He went to your right?
"A. Yes, sir.
"Q. Was he completely visible after he got in the ditch?
"A. No, sir.
"Q. Was that grass that high?
"A. Yes, sir."
Mr. Hollowell testified as follows:
"Q. Would describe to the Court what you saw of the accident?
"A. Well, we were on the Ellerbe Road, as I said, and as we were coming along I noticed a bullI was traveling north and this bull was trotting down the left hand side of the road the same direction I was heading, and I immediately slowed down, I guess to a couple of miles an hour, changed gears, and just proceeded with the bull to see what he was going to do, and I traveled, oh, several yards, and he stayed on the left hand side of the road, headed north, and when he made no attempt to cross in front of me I eased past him, and then I changed gears and went on slowly, and as I proceeded north I looked in my rear view glass and he cut behind us and went off in the ditch to the rightI guess that would be eastand we proceeded on slowly, and I saw Mr. Kennedy's car approaching and I dimmed my lights, and then as we went on I guess we could have been a block or a few feet more or less past and Mr. Herring turned to look back to see if the bull had come back on the road and I looked in my rear view mirror and as we did the bull come out of this ditch right in the path of the car and I saw his lights go out and I immediately turned around and went back to that place."
The testimony of the plaintiff, Kennedy, is that he had traveled approximately 100 to 120 feet after passing the truck when he saw the bull in his lane of travel, headed west, and that he did not have sufficient time to apply his brakes or make any effort to avoid the collision. The testimony of Mr. Kennedy is somewhat vague and uncertain with respect to the pertinent details bearing upon the actual occurrence of the collision, but we think this objection is more than overcome by the very definite, certain and positive testimony of Messrs. Herring and Hollowell, who were completely without interest in the case, were strangers to all parties involved and were so impressed with the imminent danger to plaintiffs' safe travel, by reason of the presence of the bull in the high grass on the east side of the highway and the unpredictability of his subsequent actions, that they made careful observation of the situation, and, fortunately, were able to testify in the utmost detail as to the actual occurrence of the accident.
It is too well established to longer require citation of authorities that a motorist on a public highway, traveling in his proper lane, is not required to anticipate an obstruction to his safe movement. We think it is abundantly clear that after the passage of the truck the bull moved out of the high grass on the east side of the highway, attempted to cross toward his home pasture on the west, became confused by the lights of plaintiff's approaching vehicle and either stopped or turned directly in its path. On this point plaintiff, Kennedy, testified that he frequently traveled this road, had never before observed cattle roaming the highway and was therefore completely justified in assuming that the operation of his vehicle at a normal rate of speed, in its proper lane of travel, would not meet with any obstruction from such a source.
*845 In view of our factual finding that defendant was guilty of negligence and plaintiffs were free from any act of contributory negligence, it follows that the judgment appealed from must be reversed and rendered in favor of plaintiffs.
Finally, we come to a consideration of the quantum of damages.
The actual damages for which plaintiff husband is entitled to reimbursement were established by the introduction in evidence, en globo, of a number of statements of account and checks in payment thereof which were admitted by consent of counsel for defendant subject to his objection that they should not be permitted to enlarge the pleadings. Our computation of the amounts allowable, based upon these documents and broken down into the several items of expense, is as follows:

(a). Hospital bills $1,328.09
(b). Doctor's bills 1,308.50
(c). Ambulance service 35.00
(d). Nursing and medical services
 during the period of
 Mrs. Kennedy's illness and
 incapacity 876.00
(e). Funeral expenses for Claude
 B. Kennedy, III 505.00
(f). Policy deductible representing
 loss to plaintiff husband 100.00
 _________
 Total special damages $4,152.59

Without discussion of the numerous additional items of damage claimed by plaintiff husband, many of which are either unjustified under our jurisprudence or must fail for lack of proper establishment, it suffices to say that the two remaining elements of damages to which we think he is entitled to recovery consists of the items for the death of his infant son and for his own pain, suffering and physical injuries. As to the first of these items we have fixed an amount of $5,000.00.
Mr. Kennedy's injuries principally consisted of lacerations of the left side of his face, particularly in the region of the left eye, which was itself seriously damaged to a degree which reduced the vision to 20-40. This loss of vision has been corrected by the fitting of eye glasses but will remain a permanent disability requiring the wearing of glasses by this plaintiff who was approximately 24 years of age at the time of the accident. Notwithstanding the fact that Mr. Kennedy was hospitalized for a period of only some twelve hours, more or less, he was required to undergo a number of treatments for the extraction of fragments of glass from the cornea of the left eye. According to the testimony of the treating opthalmologist, this plaintiff suffered a corneal laceration approximately one-half through the cornea, with multiple smaller corneal abrasions accompanied by the imbedding of numerous small pieces of glass in the eye and under the surface of the lid. Unquestionably, there was considerable pain and suffering, which, fortunately, appears to have endured for a comparatively brief period of time, and the principal damage resulted from the loss of vision. We have concluded that the sum of $5,000.00 should be sufficient compensation for the pain, suffering and actual loss of vision resulting directly from the injuries received in the accident.
As to the damages claimed on behalf of plaintiff wife and mother, we think the same allowance of $5,000.00 should be made with reference to the loss of her only child.
With respect to the item of pain, suffering and consequent disability, Mrs. Kennedy's injuries were extensive, severe and exceedingly painful. According to the testimony of her attending physicians, almost the entire left side of her face was caved in; there were extensive fractures of the maxilla, zygoma and mandible on the left side, accompanied by a large number of lacerations. In addition to the facial injuries, Mrs. Kennedy suffered a pneumothorax on the left side and a nature of diffused brain concussion. We think it unnecessary to detail every feature of the treatment in connection with these injuries, but it is worthy of comment that the treatment *846 was drastic, requiring, inter alia, the wiring of the jaws to completely immobilize them for a period of some six weeks, more or less, during which the patient was on a liquid diet. The period of actual hospitalization extended for some 17 days, following which Mrs. Kennedy was cared for at the home of relatives for an additional period of six to eight weeks. Following recovery and discharge from further treatment, Mrs. Kennedy has suffered from extreme nervousness and headaches, which endured up to the time of trial some fifteen months following the accident. Additionally, there was some visible evidence of scarring of the face in the region of the left eye, which, fortunately, was not serious, but, nonetheless, would be the cause of concern to a young woman who was only 21 years of age at the time of the accident. After consideration of all the factors with respect to Mrs. Kennedy's physical injuries, pain, suffering, etc., we have concluded that an award of $15,000.00 would be neither inadequate nor excessive.
Lest the awards made in this case, like Banquo's ghost, should arise in future to plague us by citation with reference to future issues of damage of somewhat similar nature, we think it advisable to observe that the condition of the record before us is somewhat lacking in the nature and extent of proof and the many elements thereof which might possibly have been presented and which could have justified awards substantially in excess of those which we have allowed.
For the reasons assigned the judgment appealed from is annulled, set aside and reversed, and
IT IS NOW ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Claude B. Kennedy, Jr., and against the defendant, L. S. Frierson, Jr., in the principal sum of Fourteen Thousand One Hundred Fifty-two and 59/100 ($14,152.59) Dollars, with interest thereon at the legal rate from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Mrs. Robbie LaTrelle Kennedy, and against the defendant, L. S. Frierson, Jr., in the principal sum of Twenty Thousand and No/100 ($20,000.00) Dollars, with interest thereon at the legal rate from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of intervenor, Southern Insurance Company, against the defendant, L. S. Frierson, Jr., in the principal sum of Eight Hundred Twenty-five and No/100 ($825.00) Dollars, with interest at the legal rate from the date of judicial demand until paid.
Defendant-appellee is taxed with all costs of both courts.