DIXON, Judge.
This is a damage suit brought for injuries sustained when plaintiff Mrs. Bras-well fell from a horse owned by one of the defendants. There was judgment for the defendants in the trial court, from which the plaintiffs appeal.
The Lawtons owned an American saddle horse named Sonny, thirteen years old and five-gaited. Desiring to sell the horse, they placed a classified advertisement in the local newspaper as follows:
“BIG Bay American Saddle horse, safe for women and children. Highly trained. 865-5620.”
On Sunday, May 1, 1966, Mrs. Braswell met Mrs. Lawton at Murrell’s Stables to ride the horse, with a view toward purchasing him.
Neither Mrs. Braswell nor Mrs. Lawton were accomplished horsewomen, although each had had some prior experience with horses. Doctor and Mrs. Braswell owned two horses, but they were not gaited saddle horses.
Mrs. Braswell contends that she relied on the representation that Sonny was a gentle horse, suitable for women and children; that while she was riding the horse, he shied for no apparent reason and bolted out from under her. Mrs. Braswell suffered serious back injuries as a result of the fall.
The plaintiffs further contend that the horse had a tendency to shy or bolt, having thrown Mrs. Lawton herself on two previous occasions.
The evidence does not establish any vicious propensity or dangerous habit in the horse in question. The record contains the testimony of previous owners of the horse and of several persons, including children, who had ridden the horse. The witnesses uniformly testified that the horse was of a gentle nature and had never been known to be unruly or to exhibit any dangerous tendency.
Shortly after the accident, in a conversation with Dr. Braswell, Mrs. Lawton had told Dr. Braswell that she had been previously “thrown” on two occasions by this horse. She did not explain to Dr. Braswell the circumstances of the occurrences, and, in view of her explanation, her choice of the word “thrown” was unfortunate. On one occasion Mrs. Lawton was riding Sonny bareback, with her three year old son on the horse in front of her. She allowed the reins to drop on the horse’s neck; the horse made an unexpected movement to one side, and Mrs. Lawton fell or slid off the animal. The other occasion on which Mrs. Lawton said she had been “thrown,” involved an improper maneuver while Mrs. Lawton attempted to mount her horse. She dropped the reins with one foot in the stirrup, and the horse moved off before Mrs. Lawton seated herself in the saddle, causing her to fall.
On the day of the accident, Mrs. Bras-well rode the horse down the road and was pleased “with the way he had gone into his gaits.” Mrs. Braswell had then taken the horse into the riding ring; she testified that while going at a “brisk walk” the horse suddenly shied, bolted forward and to the left, throwing Mrs. Braswell off to the right. Mrs. Braswell described the horse’s actions as jumping out from under her. She had been riding the horse about fifteen or tw'ehty minutes when the accident happened.
*206 One seventeen year old witness, William Clinton Bates, testified that he saw Mrs. Braswell riding the horse “at a gallop, not running”; that when the horse got near some crossties, “he moved around and she fell off.”
A fourteen year old witness, Nancy Tyler, testified that Mrs. Braswell was riding Sonny at a trot when, at a distance of ten or twelve feet from the crossties, Sonny “just sort of stepped sideways,” and Mrs. Braswell fell off backwards. This witness testified that the horse did not change his gait and did not rear or buck.
Numerous witnesses testified to the nature of the horse. It had been owned by the owner of the stable, and was rented to those who wanted to ride, except for periods when the horse was owned by other persons. Even when the horse was owned by those other than the operator of the stable, he was boarded at the stable. Except for the two incidents involving Mrs. Lawton’s own falls, there was no evidence of any previous difficulty of any nature with Sonny.
In Talley v. Travelers Insurance Company, La.App., 197 So.2d 92 (1967), it was stated:
“The law with respect to personal injuries caused by domestic animals is well settled. For one to recover for such injuries, they must satisfy the burden of proving (1) the existence of dangerous propensity of the animal inflicting the damage, and (2) knowledge of such propensity on the part of the owner of the animal. These dual requirements for liability have been uniformly accepted by our courts.”
The Louisiana Supreme Court in Tamburello v. Jaeger, 249 La. 25, 184 So.2d 544 (1966), stated:
“In speaking of what constitutes viciousness, it is stated in 3 C.J.S. Animals § 148c, pp. 1250-1251:
“ ‘A vicious propensity is a propensity or tendency of an animal to do any act that might endanger the safety of the persons and property of others in a given situation. Although an animal is actuated solely by mischievousness or playfulness, rather than maliciousness or ferociousness, yet, if it has a tendency to do a dangerous or harmful act, it has a vicious propensity within the meaning of the rule holding the owner or keeper liable for injuries resulting from vicious propensities of which he has knowledge.’ ”
The evidence in this case negatives the existence of any dangerous or vicious propensity in Sonny.
The added element of the classified advertisement, which attracted Mrs. Bras-well’s attention to Sonny initially, is conceived by the plaintiffs to make this case, in some way, different from other “horse cases.” Mrs. Lawton’s advertisement said the animal was “safe for women and children.” However, there is no evidence that Mrs. Lawton did not believe the horse to be “safe for women and children,” or at least as safe for women and children as any other gaited saddle horse. A “safe” horse is still a thing of motion with a mind of its own, intended to be directed and controlled by a rider elevated several feet above the surface of the earth, who must maintain his equilibrium with a minimum amount of mechanical assistance. If the word “safe” is to be understood with scientific precision, with no latitude and no shades of meaning, then it would be reasonable to say that no horse is “safe for women and children,” and that Mrs. Braswell, having had some experience with such animals, should have known it.
Words, however, must be taken in their ordinary and usual meaning. The evidence discloses that Sonny was about as safe as might be expected of any thirteen year old gaited saddle horse, that he did not possess any dangerous propensity, and that the numerous persons who testified at the trial knew him, without ex *207 ception, as a gentle animal. The record is not convincing that Mrs. Lawton should have reasonably anticipated that Sonny would do anything unexpected which might result in injury to Mrs. Braswell. The injury to Mrs. Braswell was not Mrs. Law-ton’s fault.
One portion of plaintiffs’ argument is that, since Civil Code Article 2321 states: “The owner of an animal is answerable for the damage he has caused. * * * ” the jurisprudence of the state has established a rule that, when an animal has caused damage, the owner will be liable unless he can prove that he was free from fault. The plaintiffs attempt to show that the burden of proof in this case is upon the defendants, since the defendants’ horse caused injury to the plaintiffs.
Civil Code Article 2321 has been interpreted numerous times, and it appears clear that it is merely an extension of the concept of liability with fault found in Article 2315.
“From a casual reading of the above codal article (2321 C.C.) one might conclude that the law imposes upon the owner of domestic animals the absolute duty to keep them contained within his own premises and that his failure to do so would impose strict liability for any damages caused by such failure. However, our courts have consistently interpreted this article to hold the owner of an animal answerable for damages caused by it only in instances where the owner is guilty of some fault or negligence in his ownership or possession of the animal. The reason for this rule is that Article 2321 is merely an amplification of Article 2315 which declares that every act of man which causes damage to another obligates him by whose fault it happened to repair it. The controlling word in Article 2315 is ‘fault.’ ”
Jamison v. Williamson, La.App., 174 So. 2d 285 (1965), at p. 287.
Plaintiff relies upon the following quotation from Liner v. McEnery, La.App., 176 So.2d 786 (1965), at page 789:
“Based upon the statutory rule, the principle is well established in the jurisprudence of this State that the owner of an animal is responsible for damage which it causes if there is any proof of negligence, however slight, on the owner’s part. Moreover, where an animal has been a cause of damage, the burden rests upon the owner to exculpate himself of even the slightest degree of negligence. (Cases cited.)
“As was particularly observed in the Kennedy case, the burden imposed upon the owner of an animal causing damage is not an insubstantial burden but requires him to establish, by proof of facts in a given case, his complete freedom from any negligence of even the slightest degree to which might be attributed the action of the animal by which damage is caused to another.”
The Liner case, and Kennedy v. Frierson, 142 So.2d 838 (1962), are cited with approval in Tamburello v. Jaeger, 249 La. 25, 184 So.2d 544 (1966).
Of the three cases, the only one applicable to the case before us is the Tam-burello case, supra. There, a young man was kicked in the face by a filly when attempting to administer medicine to a wound; there had been two prior occasions when the filly’s kicking had damaged persons. The court found that this was a “dangerous propensity” of which the owner was aware, and about which he failed to warn the injured person in spite of a reasonable expectation that damage might occur under the circumstances.
Although Kennedy v. Frierson, supra, and Liner v. McEnery, supra, were cited in the Tamburello case, neither is applicable to the case at hand.
The Kennedy case involved a situation where plaintiff’s automobile collided with defendant’s bull, which was roaming at *208 large in violation of a Caddo Parish Police Jury ordinance. The accident resulted in the death of plaintiff’s son and personal injuries to both plaintiff and his wife. The court found that the bull had escaped through (or under) a portion of the defendant’s fence that ran over a ravine. This portion of the fence was repaired and made more substantial immediately after the accident. The court did in fact find that the defendant had been negligent in not properly constructing that portion of the fence under which the bull escaped and also in not providing proper inspection and maintenance of the fence in question.
In the Liner case, plaintiff sought to recover for damages to his automobile which resulted from a collision with a horse owned by defendant, allegedly roaming at large on a rural highway in Morehouse Parish in violation of the provisions of a parish ordinance. The evidence showed and the conclusion was reached by this court that the defendant had not maintained a fence of sufficient height to restrain that horse. Therefore, this court found defendant negligent and liable for the damages to plaintiff’s automobile.
It is evident that the language quoted by plaintiffs is inapplicable to this case. Both the Kennedy case and the Liner case involved accidents resulting from collisions with animals allowed to roam in violation of parish ordinances. In such cases the burden may be on the defendant to exculpate himself of any negligence; but wherever the burden of proof may lie in such cases, in the case before us the plaintiffs must bear the burden of proving that the defendants were negligent, which is usually done by proving the dangerous propensity of the animal which caused the damage, and the owner’s knowledge of such propensity.
Consequently, the judgment of the district court is affirmed, at the cost of plaintiffs-appellants.