304 So.2d 825 (1974)
Alton SCHEXNIDER et al., Plaintiffs-Appellants,
v.
ALLSTATE INSURANCE COMPANY et al., Defendants-Appellees.
No. 4769.
Court of Appeal of Louisiana, Third Circuit.
December 16, 1974.
Rehearing Denied January 9, 1975.
*826 Baggett, Hawsey, McClain & Morgan, Robert E. Morgan, Lake Charles, for plaintiffs-appellants.
Hunt, Godwin, Painter & Roddy, Maurice L. Tynes, Lake Charles, Ryder & Deshotels by Alfred R. Ryder, Oberlin, for defendants-appellees.
Before HOOD, CULPEPPER and WATSON, JJ.
HOOD, Judge.
Alton Schexnider and his mother, Mrs. Olivia Schexnider, sue for damages sustained by them when a Datsun pickup truck owned by Mrs. Schexnider and being driven by Leroy J. Abshire collided with a horse owned by Orville Holman. The defendants are Holman and Allstate Insurance Company, the latter being the insurer of the driver of the pickup truck. Alton Schexnider seeks to recover from both defendants, while Mrs. Schexnider demands judgment only against Holman. Defendant Holman filed a reconventional demand and third party action seeking to recover the value of the horse from plaintiffs and Allstate.
Alton Schexnider entered into a compromise settlement with defendant Allstate, and an order of dismissal as to that defendant was issued, reserving to Schexnider all of his rights against Holman.
Judgment was rendered by the trial judge rejecting plaintiffs' demands against Holman, and condemning Allstate to pay to *827 third party plaintiff, Holman, damages in the amount of $200.00. The original plaintiffs, Alton and Mrs. Schexnider, have appealed.
The principal issue presented is whether Holman, the owner of the horse, was negligent. If he is found to be negligent, then a determination must be made as to whether Abshire also was negligent, a decision as to the last mentioned issue being necessary solely to determine whether Abshire was a joint tort feasor and thus whether there should be a reduction in the amount of damages due plaintiffs.
The collision occurred about 4:00 P.M. on October 13, 1973, on U. S. Highway 165 in Allen Parish. Alton Schexnider and Abshire were returning from work as electricians at the Elizabeth Paper Mill at that time. They were riding in a Datsun pickup truck owned by Mrs. Olivia Schexnider and being driven by Abshire. Schexnider was asleep in the truck at the time the accident occurred.
While the truck was being driven south on Highway 165, a horse owned by Holman ran across the southbound lane of traffic of the highway in front of the Abshire vehicle, and the front of the pickup truck struck the horse. As a result of that accident, Alton Schexnider sustained personal injuries, the truck was damaged and the horse was killed.
Highway 165 at the scene of the accident was a straight, two-lane, concrete highway running north and south. A railroad track ran parallel to and along the east side of the highway. An unnumbered parish road, running east and west, intersected and crossed Highway 165 at the point where the accident occurred. The parish road was blacktopped east of Highway 165. Defendant Holman's home was located less than 300 feet east of Highway 165 and south of the parish road. The railroad track ran between Holman's home and the highway. Highway 165 was the preferred thoroughfare at this intersection, there being stop signs on the parish road warning motorists on that road to stop before proceeding onto the highway.
The weather was clear, the highway was dry and visibility was good when the accident occurred. The legal speed limit on the highway in that area was 60 miles per hour.
Abshire was driving the pickup truck south at a speed of about 55 miles per hour just before the collision occurred. He testified that when he reached a point about 30 or 40 feet from the above intersection he saw Holman's horse running "pretty fast" in a westerly direction on the parish road toward the intersection. The horse had already crossed the railroad track when Abshire first saw it. According to Abshire, when the animal reached the highway it veered to its right, or to the north, and then proceeded to run across the highway at an angle directly in front of the pickup truck. Abshire stated that he applied his brakes immediately, but that he was unable to avoid striking the horse broadside. The evidence shows that the truck skidded 11 feet before the collision occurred.
Holman's horse was a seven year old, half Appaloosa, half quarter horse, weighing about 1,000 pounds. It customarily was kept confined in a pasture, enclosed by a fence, immediately behind Holman's home. Just before this accident occurred the horse escaped from that enclosure through a gate, and it proceeded at a "full run" through Holman's yard toward the parish road. Holman and his wife ran after the horse, attempting to head it off, but both testified that the horse outran them, reached the parish road at the point where Holman's driveway connects with that road, turned to its left and proceeded at a fast run toward the intersection of the parish road and Highway 165. Holman stated that the horse headed "on a line right down the blacktop (parish road) and onto 165." He testified that the distance from his driveway to the east edge of Highway 165 was 70 steps, and from his driveway to the center of the highway was 83 steps.
*828 Albert Ray Hall was driving a pickup truck north on Highway 165 at a speed of 35 or 40 miles per hour when the accident occurred. He first saw the horse while it was on the parish road crossing the railroad track, and he stated that it was running "full speed" toward the intersection at that time. He tried to bring his truck to a stop, since a collision between the horse and Hall's truck appeared imminent, but he was unable to do so before his vehicle reached the intersection. He was crossing the intersection when the horse arrived at that point. He stated that the horse stopped momentarily at the edge of the highway, and then turned to its right, overtook and passed the Hall pickup truck while the latter was still traveling north at a greatly reduced speed, and then turned to its left, or west, directly in front of Hall's moving vehicle and across the southbound lane of traffic into the path of the Abshire pickup truck. The collision occurred in the southbound lane of traffic while the Hall and Abshire vehicles were passing each other. Hall brought his vehicle to a stop several feet north of the point of impact shortly after the collision occurred. He testified that the horse appeared to be "spooked," that it stopped on the edge of the pavement for "just a second," thus avoiding a collision with Hall's truck, and that the horse then wheeled on his back legs, headed north, overtook Hall's moving truck and then turned to its left, running across the highway in front of Hall and into the southbound lane of traffic where the accident occurred.
Prior to the accident Holman's horse had been confined in an enclosed pasture behind the latter's home, and it had escaped from that enclosure through a gate about three feet ten inches high, and four feet wide. The gate was described by Holman as being a "yard gate." It was constructed of net wire stretched over a metal frame, and was equipped with a spring latch which automatically snapped into a "keeper" or a notch when the gate was closed. The gate had been purchased and installed about 15 years before the accident occurred. The gate posts were of pine lumber. The horse had been confined in that pasture for about seven years, and prior to the date of this accident it had never escaped through the gate.
Immediately after the accident occurred, Holman found that the gate was open, that the hinges were still in tact and that the latch was not broken. He also found that the gate post to which the hinges were attached was leaning away from the latch. He tried to close the gate after the horse escaped, but discovered that it could not be latched. He thereupon straightened the gate post up and adjusted the hinges on the gate by unscrewing or extending them out from the post about an additional inch, so that the spring latch would engage in the keeper installed for that purpose. Sometime later, about a month before the trial, he found it necessary to nail two boards on the gate post to which the hinges were attached in order that he again could move or extend the hinges a greater distance from the post to allow the latch to engage properly in the notch or the keeper.
Holman reasoned, logically we think, that the horse put his head over the gate, and that the pressure of the chest of the horse against the gate caused the latch to become disengaged and the gate to open.
Louis J. Domingue, a horse trainer, was qualified as an expert on stock fences. He testified that the gate was not designed to hold livestock, and that in his opinion the latch on the gate was not sufficient to hold an animal if the animal pushes against it. He pointed out that the hinges span a distance of about five inches between the gate and the post to which the hinges are attached, that that made the gate "wobbly," and that the gate would give either way if you push on it a little bit. He felt that since there was no barbed wire on the gate, animals were inclined to put their heads over it and push on the gate. He stated that the gate would come open if a gate post was pushed as little as one-half inch, and that the gate would open if a *829 horse would "push on the gate or the post or the fence next to the post."
J. H. Romero, a farmer who has had extensive experience in raising horses, was also qualified as an expert on stock fences. He was a neighbor of Holman and farms a part of his land. He testified that the horse involved in this accident had never escaped from Holman's pasture, and that in his opinion the gate was sufficient to keep the horse in. He conceded that a gate post could be loosened or moved if a horse pushed on it, but he did not feel that a horse would put his head over this particular gate since it was higher than the barbed wire fence on either side of it. He felt that the only way the horse could have opened the gate was to have rubbed against the latch or to have manipulated and undone the latch with its teeth.
Other neighbors of Holman testified that they had never seen the horse outside the pasture without a rider or an attendant, and that the gate through which the horse actually escaped appeared to be in good shape before the accident.
The trial judge concluded that plaintiffs had failed to prove that Holman was negligent, and he accordingly rendered judgment rejecting plaintiffs' demands. We have decided that the trial judge erred in arriving at that conclusion.
LSA-R.S. 3:2803 provides that "No person owning livestock shall knowingly, willfully or negligently permit his livestock to go at large" upon certain highways in this state, including Highway 165. The highway on which this accident occurred thus was a "stock law" highway, and Holman was prohibited from permitting his horse to go at large upon that highway.
Although Article 2321 of the Louisiana Civil Code seems to impose absolute liability upon the owner of an animal, that article has been interpreted as being subject to the negligence or fault requirements of Articles 2315 and 2316 of the Civil Code. Tripani v. Meraux, 184 La. 66, 165 So. 453 (1936); Tillman v. Cook, 3 So.2d 230 (La.App.Orl.1941); Raziano v. T. J. James & Co., 57 So.2d 251 (La.App.Orl.1952).
The law is settled that when an automobile strikes a horse or cow on a "stock law" highway, the burden of proof rests upon the owner of the animal to establish that he was not negligent in allowing it to be on the highway at that time. Brown v. Fulton Insurance Company, 211 So.2d 412 (La.App. 3 Cir. 1968); Fortenberry v. McCoy, 233 So.2d 320 (La.App. 1 Cir. 1970); Gabbard v. Areno, 302 So.2d 45 (La.App. 3 Cir. 1974, Docket No. 4693); Richard v. Guillot, 284 So.2d 127 (La.App. 3 Cir. 1973).
Although there is a strong presumption of fault or negligence on the part of the owner of a horse or cow who permits the animal to escape and get on a stock law highway, that presumption is rebuttable. Raziano v. T. J. James & Co., supra, and cases cited therein. In order for the owner of an animal to overcome the presumption of fault and to exculpate himself from liability, however, the burden rests on him to show that he was without the slightest fault, and that he did all that was possible to prevent the injury. Colomb v. McDonald, 131 So.2d 84 (La.App. 3 Cir. 1961); Kennedy v. Frierson, 142 So. 2d 838 (La.App. 2 Cir. 1962); Raziano v. T. J. James & Co., supra.
In Kupper v. Connolly, 153 So.2d 915 (La.App. 1 Cir. 1963), where issues similar to those presented here were considered, the court found that the owner of livestock had failed to exonerate himself from fault. The court said:
"Defendant's gate was closed with a piece of clothesline wire. After the accident, it was found that this piece of wire had been straightened out by the gate having been opened. It would appear that the gate was actually pushed open by the cattle from within, and that the wire was not adequate to hold the gate closed. Defendant points out that *830 no cattle had ever escaped from this pasture before. It is the opinion of the Court that this does not show that defendant is now free from negligence, but rather that he has been lucky in the past."
In Raziano v. T. J. James & Co., supra, the court said "A fortiori, the burden of proof is on the owner to show that he was without the slightest fault and did all that was possible to prevent the injury."
In Jamison v. Williamson, 174 So.2d 285 (La.App. 2 Cir. 1965), the owner of the cow was held to have been negligent in failing to maintain a proper enclosure for his livestock. The Court of Appeal, Second Circuit, said:
"Therefore, the issue before us is narrowed to whether there has been proof of negligence, however slight, against the owner of the cows in allowing them to escape from his enclosed pasture. On this question, we conclude such proof has been made. Several specific acts of negligence were proved, such as allowing staples from the barbed wire to become loosened in several places, which might have permitted a cow to escape between the wires. It was also shown that some of the creosote posts were leaning to such an extent that a cow could possibly escape and further, any one of the gates to the enclosure, which were fastened but not locked, could have been opened by third persons and the cattle allowed to escape."
In the instant suit the fact that Holman's horse escaped and ran upon a stock law highway creates a presumption of fault or negligence on the part of Holman. The burden rests on that defendant to rebut that presumption and to show that he was free from fault. We have concluded that defendant Holman has failed to meet that burden of proof, and that he thus must be held to have been negligent and liable to plaintiffs for the damages they sustained.
The evidence convinces us that the gate through which Holman's horse escaped was inadequate to restrain livestock. It was a "yard" gate, not designed to restrain livestock. The latch on it was a spring type latch which fitted into a keeper or notched retainer, and only a slight pressure against the gate was required to disengage the latch and allow the gate to open, even if the posts were in proper position. In this case the evidence shows that one of the gate posts was leaning away from the latch, allowing the gate to be opened with even less pressure than ordinarily would be required. The hinges on the gate spanned a distance of about five inches between the gate and the gate post, causing the gate to be wobbly and susceptible to being opened by a slight pressure on the gate, or on a gate post, or on the fence near the gate.
We agree with Holman's reasoning that the horse merely pushed on the gate and caused the latch to become disengaged and the gate to spring open without damaging the gate or the latch.
Holman had had at least seven years experience in maintaining a horse in that pasture, and he testified that he also had kept or was keeping some cattle for his brother. With that experience it seems to us that he should have observed that the gate was inadequate to restrain livestock of any kind, even if this horse had not pushed the gate open prior to the date on which the accident occurred.
Our conclusion is that Holman was negligent in failing to maintain an adequate gate for the purpose of enclosing his horse near a stock law highway. His negligence was a proximate cause of the accident, and Holman thus is liable to plaintiffs for the damages they sustained as a result of this accident.
We turn now to the question of whether Abshire, the driver of the pickup truck, also was negligent.
Alton Schexnider is entitled to recover all of the damages he sustained from *831 Holman if the latter is found to be the sole tort feasor. Holman, however, is liable to Schexnider for only one-half the damages the latter sustained, if it is determined that Abshire was also negligent and that Abshire thus was a joint tort feasor. This is true because of the fact that Schexnider has released Abshire's insurer from liability. Laird v. State Farm Insurance Company, 290 So.2d 343 (La.App. 4 Cir. 1974), writ refused, 293 So.2d 184; Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3 Cir. 1964).
The trial judge held that Abshire was negligent in failing to keep a proper lookout, and that the insurer of the pickup truck he was driving thus was liable to Holman for the value of the horse which was killed in the accident. We have decided that the trial judge erred in that finding.
Abshire was driving at a reasonable rate of speed immediately before and at the time the accident occurred. He had no reason to suspect that a horse would dart across the highway in front of his vehicle. He nevertheless saw the horse running "pretty fast" toward the intersection when he was 30 or 40 feet from the intersection and when the horse was somewhere between the railroad track and the edge of Highway 165. He immediately applied the brakes of his pickup truck causing the wheels to skid, but despite his efforts to bring the truck to a stop he was unable to avoid striking the horse when the animal darted across the highway in front of him.
Hall, who was driving a pickup truck north, saw the horse running at a fast rate of speed toward the intersection as it was crossing the railroad track. Although Hall was driving his vehicle slower than was Abshire, Hall also was unable to bring his truck to a stop before it crossed the intersection. The only reason Hall's vehicle did not strike the horse was that the animal stopped momentarily at the edge of the highway, and then ran around in front of Hall's moving truck before it darted across the highway in front of the approaching Abshire vehicle. Hall was unable to bring his slower moving truck to a stop until after he had passed the Abshire vehicle and the accident had occurred.
We find that Abshire was confronted with an emergency when the horse suddenly ran at a fast rate of speed toward the intersection and across the highway, that Abshire acted reasonably under the circumstances and did everything within his power to avoid a collision. We conclude that Abshire was free from negligence, that the accident resulted solely from the negligence of Holman in failing to properly restrain the horse, and that Holman alone is liable to plaintiffs for the damages they sustained.
As a result of the accident Alton Schexnider sustained a deep laceration of the left leg just below the knee. Following that injury he experienced a period of pain and swelling in the knee joint, but he apparently has no permanent disability as a result of the accident. His medical bills amounted to $553.95. He lost two and one-half weeks of work because of his injuries, and we compute his loss of wages at $809.00. Holman appears to be a person of modest means, and we have considered that fact in determining the amount of damages which should be assessed.
Our conclusion is that an award of $1,000.00 as general damages to Alton Schexnider, plus special damages in the amount of $1,362.95, making a total award of $2,362.95, would be fair and adequate.
The pickup truck owned by Mrs. Schexnider was damaged in the accident to the extent that it was a total loss. It had a value of $1,000.00 at that time. Mrs. Schexnider thus is entitled to recover that amount from defendant Holman.
For the reasons assigned, the judgment appealed from is reversed, and judgment is hereby rendered: (1) In favor of plaintiff, Alton Schexnider, and against defendant, Orville Holman, for the sum of $2,362.95, with legal interest thereon from date of judicial demand until paid; and (2) in favor of plaintiff, Mrs. Olivia Schexnider, and *832 against defendant, Orville Holman, for the sum of $1,000.00, with legal interest thereon from date of judicial demand until paid. Defendant Holman is condemned to pay all costs of this suit. The costs of this appeal are assessed to defendant-appellee, Orville Holman.
Reversed and rendered.
WATSON, J., concurs in part, and dissents in part assigning written reasons.
WATSON, Judge (concurring in part and dissenting in part):
The majority opinion deals with two issues: (1) the responsibility of the owner of the horse and (2) negligence on the part of Abshire, the driver of the vehicle in which one plaintiff was riding. As to the result reached by the majority on the first issue, I concur, but as to the result reached on the second issue, I dissent, being of the opinion that the trial judge was not manifestly in error in finding Abshire negligent.
As to the first issue, I agree that Holman, the owner of the horse, is responsible under the law to the damaged parties, but I believe that it is important to note the correct basis of liability.
By statute and by past jurisprudence the stock owner has been required to prove himself free from negligence in allowing an animal to escape and roam at large. LSA-R.S. 3:2803; Fortenberry v. McCoy, 233 So.2d 320 (La.App. 1 Cir. 1970); writ refused 256 La. 252, 236 So.2d 31. Gabbard v. Areno, 302 So.2d 45 (La.App. 3 Cir. 1974). Under the line of cases exemplified by Fortenberry, I would agree with the majority that the owner did not prove himself free of negligence.
However, the majority declines to recognize the recent decision of Holland v. Buckley, ___ So.2d ___, (La., 1974) handed down by the Louisiana Supreme Court on October 28, 1974, in which LSA-C.C. art. 2321 was interpreted to mean that when a domesticated animal harms another, the master of the animal is presumed to be at fault. The Supreme Court held that this fault is in the nature of strict liability and is an exception to or an addition to recovery on the basis of negligence.
"The owner may exculpate himself from such presumed fault only by showing that the harm was caused by the fault of the victim, by the fault of a third person for whom he is not responsible, or by a fortuitous event. . . . Under our present holding, the owner can exculpate himself from the fault of having his animal hurt someone only by proving that the harm resulted from some independent cause not imputable to the defendant."
It is interesting to note that the court distinguished strict liability for domesticated animals from absolute liability in the case of wild animals, citing Briley v. Mitchell, 238 La. 551, 115 So.2d 851 (1959). There being only two categories of animals, domesticated and wild, a horse used for riding purposes would fall in the category of domesticated animals, and the owner would be held under the doctrine of strict liability for injuries caused by his animal.
On the second issue, the majority has made a factual determination that Abshire, the driver of the pickup truck, was negligent. The majority does not indicate that our esteemed colleague of the trial court committed manifest error in the factual determination, but only that he "erred".
No citation or authority is necessary for the proposition that it is required on appellate review to find manifest error before reversing the trial court on a finding of fact.
On the facts found by the majority: that the horse was running down the parish road across the railroad track; that the Hall vehicle, which was traveling 35 or 45 miles an hour, slowed; that the horse stopped momentarily on the side of the road; that the horse then turned to its right, overtook and passed the Hall pickup truck on the right side; that it then turned *833 left in front of Hall's moving vehicle and crossed into the southbound lane of traffic where it was struck by the pickup truck driven by Abshire, I would conclude that the majority's decision that Abshire was not negligent in failing to see the horse is reasonable. On the other hand, on these facts and especially considering the opportunity that he had to hear the witnesses and better evaluate their credibility, I think the conclusion of the trial judge that Abshire was negligent in failing to see the horse is equally reasonable, and in fact, possibly even more reasonable.
Therefore, I cannot say that the error of the trial court (if indeed it erred) is manifest which I understand to mean evident, apparent and obvious.
Finding that Abshire was correctly held to be negligent by the trial court, I would reduce by one-half the amount that Holman is cast for damages, thus giving him the benefit of whatever amount Allstate Insurance Company paid in settlement on behalf of Abshire to the plaintiff who suffered personal injury.
I concur in part and respectfully dissent in part.